UNITED STATES of America

v.

YONKERS CONTRACTING COMPANY, INC., et al., Defendants.

No. 87 Crim. 560 (WCC).

United States District Court, S.D. New York.

Dec. 7, 1988.

Ralph T. Giordano, Atty., Dept. of Justice, Chief, Antitrust Div., New York City, for U.S.; Rebecca Meiklejohn, Geoffrey Swaebe, Jr., Attys., Dept. of Justice, Antitrust Div., of counsel.

Kelley Drye & Warren, New York City, for Peckham Materials Corp.; Robert E. Crotty, of counsel.

Baden, Kramer, Huffman & Brodsky, P.C., New York City, for Edward J. Petrillo, Jr.; William M. Brodsky, of counsel.

Berman, Paley, Goldstein & Berman, New York City, for Yonkers Contracting Co., Inc.; David R. Paley, of counsel.

Marchi Jaffe Steinberg Crystal Katz & Burke, New York City, for County Asphalt, Inc.; David Jaffe, of counsel.

Loeb and Loeb, New York City, for Nigro Bros., Inc., Peter Nigro and August Nigro; Harry First, Charles H. Miller, of counsel.

Ross & Hardies, Washington, D.C., for Frank D. Cooney, Jr.; Myles J. Ambrose, of counsel.

Dunnells, Duvall, Bennett & Porter, Washington, D.C., for William A. Bassett; Robert S. Bennett, of counsel.

Santangelo, Santangelo & Cohen, New York City, for Area Paving Corp. and Matthew N. Mauriello; Susan G. Kellman, of counsel.

Scoppetta & Seiff, New York City, for Putnam Asphalt Corp. and Anthony B. Cahill; Eric A. Seiff, of counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

This action is before the Court on the Government's motion to admit into evidence the grand jury testimony of Thomas J. Broder, a recently deceased government witness. The Government argues that the testimony is admissible under Rule 804(b)(5), Fed.R.Evid. Defendants contend that admission of the testimony violates both the Federal Rules of Evidence and the

Confrontation Clause, U.S. Const. amend VI. For the reasons stated below, the Government's motion is granted.

## BACKGROUND

Defendants are charged with conspiring to rig bids for the sale of asphalt and for asphalt paving contracts in violation of Section 1 of the Sherman Act. The Government alleges that defendants' conspiracy affected numerous government contracts for the purchase of asphalt or for paving in Westchester County.

Thomas J. Broder ("Broder"), the witness whose testimony this motion concerns, became Vice President of defendant Peckham Materials Corp. ("Peckham Materials") in 1972. The Government alleges that he played an integral role in the conspiracy.

Broder testified before a Connecticut grand jury on October 29, 1985. On July 16, 1986, he testified before the grand jury that ultimately indicted the defendants in this criminal prosecution. Government attorneys had interviewed Broder the night before. His testimony during both investigations was given under a grant of immunity.

On October 1, 1988, the attorney for defendant Peckham Materials notified the Government and the Court of Broder's death. On November 14, 1988, one week before trial, the Government indicated that it might introduce Broder's grand jury testimony at trial under Rule 804(b)(5). Defendants opposed the motion.

## DISCUSSION

The Government argues that Broder's grand jury testimony is admissible under Rule 804(b)(5). That Rule, applicable "if the declarant is unavailable as a witness" within the meaning of Rule 804(a), permits the admission of a hearsay statement which is

> not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it

is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

In sum, the Rules permit hearsay to be admitted under the "residual" exception provision, where:

(a) the declarant is "unavailable";

(b) the hearsay is "not specifically covered" by another hearsay exception;

(c) there are "circumstantial guarantees of trustworthiness";

(d) the evidence is "more probative" on a "material" issue than any other reasonably available evidence;

(e) the "interests of justice" are served by its admission; and

(f) the proponent has given the opposing party adequate "notice" of its intent to introduce the evidence.

The Government has met its burden of establishing these criteria in the case at hand.

### 1. *Unavailability*

■ A witness is unavailable if he "is unable to be present or to testify at the hearing because of death." Fed.R.Evid. 804(a)(4). It is undisputed that Broder is dead. Defendants nevertheless contend that the Government had a duty to take reasonable precautions to preserve Broder's testimony by deposing him pursuant to Rule 15(a), Fed.R.Crim.P. They argue that the Government's failure to act reasonably precludes it from claiming that Broder is now "unavailable." I disagree.

First, it is by no means clear that the Government is under a duty to preserve a

witness's testimony. Originally, the definition of "unavailability" in Rule 804 contained "no requirement that an attempt be made to take the deposition of a declarant." Original Advisory Committee's Note to Rule 804. It merely provided that if the unavailability resulted "from the procurement or wrongdoing of the proponent of the statement," the witness would not be considered unavailable. *Id.*

The Rule's definition of unavailability was amended by Congress in 1973. The amendment was extremely narrow. It concerned the admission of an "absent" witness's testimony, within the meaning of 804(a)(5), under hearsay exceptions 804(b)(2) (declarant's death was imminent), (3) (statement against interest), and (4) (statement of personal or family history). Congress determined that such hearsay should not be admitted unless the proponent had made an "attempt ... to depose [the] witness." H.Rep. No. 650, 93d Cong., 1st Sess. 15 (1973), *quoted in* 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 804–5 (1988).

Significantly, Congress did not amend clauses (a)(4) (ill or dead witness is unavailable) or (b)(5) (the residual hearsay exception). That the legislative branch decided to amend one part of the unavailability definition, by imposing a duty that a party attempt to take depositions of a witness if it appears that he may become unavailable, suggests that its failure to extend this requirement to the other parts of the unavailability definition was intentional. Thus to hold that the Rule's definition of "unavailability" requires the Government to depose Broder would be to impose a duty that Congress deliberately declined to create.

█ Admittedly, the definition of "unavailability" recognizes that if the unavailability is caused by the proponent of the statement "for the purpose of preventing the witness from attending or testifying," the hearsay will be inadmissible. Fed.R. Evid. 804(a). Yet under this provision,

mere negligence will not preclude admission of the statement. *See United States v. Seijo*, 595 F.2d 116, 120 (2d Cir.1979) (evidence admissible where no evidence of Government's "malicious intent" in deporting witness).

Similarly, Rule 15(a), Fed.R.Crim.P., does not impose a duty on a party to preserve the testimony of a witness that may become unavailable. Rule 15(a) provides in pertinent part:

> Whenever due to exceptional circumstances of the case it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved for use at trial the court may upon motion of such party and notice to the parties order that testimony of such witness be taken by deposition....

The text of the Rule does not require that a party move for such a deposition. Indeed, while the advisory notes specify that the principal objective of the Rule is "the preservation of evidence for use at trial," there is no indication that the Rule was to do anything more than sanction the taking of depositions in exceptional cases. *See* Advisory Committee Notes to Rule 15.

Defendants do not point to any cases supporting the novel proposition that when the Government does not avail itself of its right to depose a witness under Rule 15(a), the witness cannot be "unavailable" if he subsequently dies.[1] Indeed, in the only case in which the Second Circuit Court of Appeals considered the interplay of Rule 15(a) and Rule 804(a), it gave Rule 804(a) a "literal" reading, and refused to exclude the evidence without a showing of more than negligence. *Seijo*, 595 F.2d at 120.

Finally, defendants argue that under the Confrontation Clause, the prosecution must have deposed a terminally ill witness, if his testimony is to be admitted into evidence after his death. While satisfying the Rules of Evidence does not *ipso facto* meet the

---

**1.** The cases defendants cite are inapposite. *See, e.g., United States v. Mann,* 590 F.2d 361, 367 (1st Cir.1978) (decided under Rule 804(a)(5) which requires that proponent show that he was unable to obtain testimony by "other reasonable

means"); *Ray v. United States,* 367 F.2d 258, 264 (8th Cir.1966) (concerned defendant's failure to make use of Rule 15, but did not involve Rule 804), *cert. denied,* 386 U.S. 913, 87 S.Ct. 863, 17 L.Ed.2d 785 (1967).

requirements of the Confrontation Clause, it cannot be overlooked that the requirements of the Rules and the Clause are remarkably similar. For example, while the Supreme Court has cautioned that "[a] demonstration of unavailability ... is not always required" before hearsay evidence can be admitted, *Ohio v. Roberts*, 448 U.S. 56, 65 n. 7, 100 S.Ct. 2531, 2538 n. 7, 65 L.Ed.2d 597 (1980); *see also United States v. Inadi*, 475 U.S. 387, 394, 106 S.Ct. 1121, 1126, 89 L.Ed.2d 390 (1986), it has suggested that, ordinarily, "the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." *Roberts*, 448 U.S. at 65, 100 S.Ct. at 2538. Like the Rule, the Clause imposes a duty upon the prosecution to take reasonable efforts to procure its witnesses' presence at trial. *Id.* at 74, 100 S.Ct. at 2543. Yet, just as Congress refused to amend 804(a)(4) to require that the proponent attempted to depose the witness, the Court, in interpreting the Confrontation Clause, has refused to extend the "good-faith effort" requirement to cases involving unavailability because of death: "[I]f no possibility of procuring the witness exists (as, for example, the witness' intervening death), 'good faith' demands nothing of the prosecution." *Id.* In sum, defendants' contention that the Government had a duty to take reasonable precautions to preserve Broder's testimony is without support.

In any event, the facts show that the steps the Government took were reasonable under the circumstances. It is not clear when the Government learned that Broder was terminally ill. Defendants suggest that it may have been as early as October 29, 1985, when Broder testified in the Connecticut grand jury. Yet, Broder did not specifically state that his condition was terminal at that time. *See* Connecticut Grand Jury Testimony of Thomas J. Broder at 6–7 (testifying that he had "inoperable lung cancer"). It is more likely that the Government learned that the disease was terminal on June 2, 1986. At that time, the Government was told that Broder might die within one year. *See* Affidavit of Ronald W. Meister ¶ 2. By December 22, 1987, all the parties were aware of Broder's condition. At that time, the Government indicated that it was considering taking Broder's deposition pursuant to Rule 15(a), Fed.R.Crim.P. The facts after that point are disputed. The Government contends that Broder's counsel promised to keep the Government informed of Broder's condition:

> As of December 1987, the government believed based on conversations with Broder's counsel, that Broder's condition was stable. It had asked counsel to advise if his condition changed. The government first learned that Broder was worse only several days before he died when it contacted Broder's counsel to arrange for service of a subpoena and to inquire about his availability for pretrial preparation.

Government's Brief at 2–3. Broder's counsel, however, offers a different account:

> I specifically told the government's lawyers that I would not be troubling Mr. Broder with periodic inquiries about his terminal illness, but would inquire into his health in response to any requests that they made that I do so. I did not promise the government's lawyer that I would regularly advise them of Mr. Broder's condition in the absence of government requests.... [T]he government contacted me infrequently to request information about Mr. Broder's condition. My records reflect conversations with attorneys from the Antitrust Division on July 7, 1987; August 26, 1987, and May 3, 1988. I recall no communications with the Antitrust Division between May 3 and September 28. It was only in response to [the government's] September 28 inquiry that I contacted Mr. Broder and learned of his worsened condition, which led to his death on October 1.

Affidavit of Ronald W. Meister ¶¶ 4–5.

I cannot conclude that the Government acted unreasonably under the circumstances. It is easy, in hindsight, to say that a prompt deposition of Broder would have been the most prudent course. A reasonable person, however, might have also attempted to conserve resources by taking

the deposition only if it became clearly necessary. Moreover, defense counsel's scheduling conflicts delayed the trial of this case. It would be unfair to penalize the Government for this unanticipated delay. In sum, Broder's unavailability has been satisfactorily established.

### 2. Applicability of Other Hearsay Exceptions

■ The residual exception to the hearsay rule can only be relied upon where the evidence is "not specifically covered by any of the [other hearsay] exceptions." Fed.R. Evid. 804(b)(5). Defendants argue that this Court should follow Judge Sarokin of the District of New Jersey in holding that grand jury testimony cannot be admitted under the residual exception since it is covered by the "former testimony" exception, Fed.R.Evid. 804(b)(1). *United States v. Vigoa*, 656 F.Supp. 1499, 1504–06 (D.N.J. 1987), *aff'd* 857 F.2d 1467 (3d Cir.1988). I am not persuaded by Judge Sarokin's reasoning, and thus decline to follow *Vigoa.*

First, while the Second Circuit has not considered the admissibility of grand jury testimony under Rule 804(b)(5), *see United States v. Mastrangelo*, 693 F.2d 269 (2d Cir.1982) (avoiding resolution of "the difficult legal and constitutional questions" arising under the Confrontation Clause and Rule 804(b)(5)), *cert. denied*, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 343 (1984), *Vigoa* is at odds with the holdings of every other circuit court that has considered the issue. *See, e.g., United States v. Guinan*, 836 F.2d 350 (7th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 2871, 101 L.Ed.2d 907 (1988); *United States v. Marchini*, 797 F.2d 759 (9th Cir.1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1288, 94 L.Ed.2d 145 (1987); *United States v. Murphy*, 696 F.2d 282 (4th Cir.1982), *cert. denied*, 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1303 (1983); *United States v. Barlow*, 693 F.2d 954 (6th Cir.1982), *cert. denied*, 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983); *United States v. Boulahanis*, 677 F.2d 586 (7th Cir.), *cert. denied*, 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982); *United States v. West*, 574 F.2d 1131 (4th Cir.1978); *United States v. Carlson*, 547 F.2d 1346 (8th Cir.1976), *cert. denied sub nom. Hofstad v. United States*, 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977).

■ Second, Judge Sarokin placed great reliance on the fact that grand jury testimony constitutes "former testimony" within the meaning of 804(b)(1). 656 F.Supp. at 1504–05. The Government in *Vigoa* apparently conceded as much. *Id.* at 1504. The advisory committee notes to Rule 804(b)(1), however, indicate that this assumption was misguided. "Former testimony does not rely on some set of circumstances to substitute for oath and cross-examination, since both oath and opportunity to cross-examine were present in fact." The Rule, therefore, does not use the common sense meaning of the phrase "former testimony." And under the definition the Rule adopts for the phrase, grand jury testimony can never be "former testimony," since grand jury witnesses are never cross-examined.

### 3. Trustworthiness

■ Under Rule 804(b)(5), grand jury testimony can only be admitted if there are circumstantial guarantees of its trustworthiness, comparable to the indicia that assure the reliability of evidence admitted under other hearsay exceptions. It may be, under the Supreme Court's most recent discussions of the Confrontation Clause, that the Constitution's requirements are satisfied where evidence is admissible under the Rule. *Cf. Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987) (hearsay exception for co-conspirators' statements is so firmly rooted in our jurisprudence, that independent inquiry is unnecessary). In any event, it is well-settled that the Confrontation Clause does not demand the presence of every witness. *Ohio v. Roberts*, 448 U.S. 56, 63, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980). A defendant's Sixth Amendment rights are not compromised by the loss of an opportunity to cross-examine if the prosecution has demonstrated sufficient "indicia of reliability." *Bourjaily*, 107 S.Ct. at 2782.

While the Second Circuit has not spelled out the inquiry to be followed in assessing the trustworthiness of hearsay, the following factors have been considered by other circuits:

a.  Testimony was under oath. *United States v. Curro*, 847 F.2d 325, 327 (6th Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 116, 102 L.Ed.2d 90 (1988); *United States v. Boulahanis*, 677 F.2d 586, 588 (7th Cir.), *cert. denied*, 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982); *United States v. Carlson*, 547 F.2d 1346, 1354 (8th Cir.1976), *cert. denied sub nom. Hofstad v. United States*, 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977);

b.  Witness was represented by counsel. *United States v. Marchini*, 797 F.2d 759, 764 (9th Cir.1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1288, 94 L.Ed.2d 145 (1987);

c.  Testimony concerns personal knowledge. *Marchini*, 797 F.2d at 764; *Carlson*, 547 F.2d at 1354; *United States v. Barlow*, 693 F.2d 954, 962 (6th Cir.1982), *cert. denied*, 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983);

d.  Witness did not recant testimony. *Curro*, 847 F.2d at 327; *Marchini*, 797 F.2d at 764; *Carlson*, 547 F.2d at 1354;

e.  Witness had no motive to falsify given witness's relationship to the Government and defendants. *United States v. Guinan*, 836 F.2d 350, 355 (7th Cir.), *cert. denied*, — U.S. —, 108 S.Ct. 2871, 101 L.Ed.2d 907 (1988); *Barlow*, 693 F.2d at 962; and

f.  Corroborating evidence is available. *Curro*, 847 F.2d at 327; *United States v. Papadakis*, 572 F.Supp. 1518 (S.D.N.Y. 1983) (Weinfeld, J.) (court noted that testimony was consistent with notes of witness's statement previously taken by law enforcement officers), *aff'd*, 739 F.2d 784 (2d Cir.1984).

Broder's grand jury testimony satisfies most, if not all, of these factors and is therefore sufficiently trustworthy to be considered by the jury. Broder was under oath in the grand jury, and subject to the penalty of prosecution for perjury. He was represented by counsel, and availed himself of his opportunity to consult with counsel during the examination. His testimony that he became aware of, and participated in a conspiracy to rig bids certainly concerns facts within his personal knowledge. While to some extent, the grand jury testimony contradicts statements that Broder previously made to a Connecticut grand jury, *see* Connecticut Grand Jury Testimony of Thomas J. Broder at 48–52 & 78–79, Broder never recanted the testimony that the Government now seeks to admit into evidence. Defendants have not suggested any motive that Broder had to lie to the New York grand jury. The testimony that Broder gave under immunity incriminated many of his friends and former business associates. Moreover, it subjected him to substantial disgrace. *See* Advisory Committee Notes to Rule 804(b)(3) (Rule permitting admission of hearsay statements against interest includes "statements tending to expose declarant to hatred, ridicule, or disgrace, the motivation here being considered as strong as when financial interests are at stake").

Defendants, however, contend that Broder's grand jury testimony must be kept from the jury since it is not corroborated, and is in part contradicted by other evidence in the case. Even if defendants' claim were correct, I would admit the testimony since corroboration is only one factor that must be considered by the trial judge when evaluating whether a hearsay statement is accompanied by sufficient circumstantial guarantees of trustworthiness within the meaning of Rule 804(b)(5).

I find, however, that Broder's testimony is corroborated by the testimony of another former Peckham Materials employee and government witness, Joseph Tartaglia ("Tartaglia"), and the notes government attorneys took during their earlier interview of Broder. While the corroboration is at times imperfect and incomplete, "a court cannot require that every detail of an item of hearsay testimony be corroborated before admitting it under Rule 804(b)(5)." *Guinan*, 836 F.2d at 357.

There are a number of impressive similarities between the stories given by Bro-

der and Tartaglia. For example, in describing how members of the alleged conspiracy, when negotiating the assignment of territories, determined the distance between the defendants' asphalt plants and the paving projects, both witnesses testified that the distance was "clocked" on car odometers. Broder added that he drove to jobs to "clock the distance from each plant," and on a number occasions accompanied Tartaglia on such trips. New York Grand Jury Testimony of Thomas J. Broder at 59 & 77 [hereinafter Broder G.J. Tr.]. Tartaglia's testimony as to this incriminating detail was identical:

> The system was that if there was a project that was close to both plants or three plants that you would get together with the individuals of these other companies and if there was a dispute as to the mileage, you would get in the car and you drive together and you take the mileage regardless of how the automobile goes, whether you go through a cow field, a pasture, whatever, not the way a truck would drive but the way—and if you wanted to take a jeep, you could take a jeep as long as you were closest to the plant.

Trial Testimony of Joseph Tartaglia at 235–36 [hereinafter Tartaglia T. Tr.].

Tartaglia's testimony also corroborates another detail in the alleged scheme. Broder described the manner in which Tartaglia, the "liaison" between Peckham Materials and its competitors, communicated with him as follows: "In most cases [Tartaglia gave me] a number jotted down on a scrap of paper that we were to exceed in our bid." Broder G.J. Tr. at 63. Tartaglia testified that, at least on one occasion, he wrote down the number to "cover" when bidding, and gave it to Broder. Tartaglia T. Tr. at 223.

At trial, Tartaglia indicated that he attended two meetings at defendant County Asphalt's offices. He testified that Broder only attended one of the meetings. Tartaglia T. Tr. at 216–226. In the grand jury, Broder testified that, while he could not remember what was discussed, he did recall a meeting at County Asphalt that all

the producers attended. Broder G.J. Tr. at 55–56.

Finally, both Broder and Tartaglia testified that when James V. DeForest, an unindicted co-conspirator, became President of Peckham Materials he was informed that bids were being rigged. Tartaglia T. Tr. at 289 ("I asked him if he wanted me to continue doing what I was doing"); Broder G.J. Tr. at 78 ("over the span of time, Mr. DeForest became aware of what I was having Joe Tartaglia do").

Despite these similarities, defendants point to a number of discrepancies between Broder's and Tartaglia's testimony. For example, defendants argue that the witnesses disagree as to when their scheme began. Admittedly, Broder testified that Tartaglia began reporting to Broder, presumably to hand him the scraps of paper indicating what to bid, in 1972. Broder G.J. Tr. at 75–76. This is, however, reconcilable with Tartaglia's account. When asked when he first met with all the producers to *discuss* bids, Tartaglia answered in 1979 or 1980. Tartaglia Tr. T. at 216.

Defendants also claim inconsistency with respect to whether Tartaglia met with defendant Edward J. Petrillo, Jr. ("Petrillo") when negotiating with Peckham Material's competitor, Plaza Materials. Tartaglia testified that he met with other representatives of that competitor. Tartaglia Tr. T. at 225, 231 & 255–56. Broder, on the other hand, told the grand jury that Tartaglia "would often say, I saw Petrillo today, or I would see Plaza. When he said, I would see Plaza, I always made the assumption he saw Petrillo." Broder G.J. Tr. at 70. This is not a discrepancy. It is possible that Tartaglia did not meet with Petrillo himself, but told Broder that he did. The testimony of both Tartaglia and Broder could be true.

During oral argument, defendants contended that the notes taken by the prosecution during an interview of Broder do not corroborate Broder's grand jury testimony. I disagree. The notes indicate that in 1972, Tartaglia told Broder about the territorial divisions. Moreover, they describe the piece of paper with a number that Tartag-

lia used to communicate with Broder. Broder's grand jury testimony was consistent with this confession. Broder G.J. Tr. at 32 & 63.

Defendants also urge denial of the Government's motion on the ground that Broder's New York grand jury testimony is contradicted by his earlier testimony in the Connecticut grand jury. There is clearly a difference, however, between the later recantation of the testimony offered by the Government, and an inconsistency between that testimony and earlier testimony given before the witness decided to incriminate his associates and friends. Defendants will certainly be afforded an opportunity to present Broder's earlier testimony to the jury, and to offer an explanation during their summation as to why Broder's New York testimony should be discounted.

### 4. *Probative Value*

■ To be admissible under Rule 804(b)(5), Broder's testimony must be "more probative" on a "material" issue in this case than any other evidence reasonably available to the Government. It is undisputed that Broder's testimony is "material." *See U.S. v. Iaconetti*, 406 F.Supp. 554, 559 (E.D.N.Y.) (Weinstein, C.J.) (not used for trivial or collateral matters), *aff'd*, 540 F.2d 574 (2d Cir.1976), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 739, 50 L.Ed.2d 752 (1977). Yet defendants contend that, if this Court finds that Tartaglia's testimony corroborates Broder's testimony, it cannot also conclude that Broder's testimony is "more probative" than any other evidence available to the Government. As defendants correctly point out, however, some of Broder's testimony is uncorroborated. The Sixth Circuit recently admitted the testimony of an unavailable witness which was corroborated in part, and cumulative in part:

> The mere fact that, in a case involving multiple parties and multiple offenses, there is some overlap between the testimony of available witnesses and a non-available witness does not result in a violation of the safeguard provisions of Rule 804(b)(5).

*U.S. v. Curro*, 847 F.2d 325, 328 (6th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 116, 102 L.Ed.2d 90 (1988); *see also id.* ("[W]hen Rule 804(b)(5)(B) states that the statement offered should be 'more probative.... than any other evidence which the proponent can procure through reasonable efforts,' it is not intended to mean that corroboration is fatal to admission.").

### 5. *The Interests of Justice*

■ I am persuaded that the admission of Broder's grand jury testimony will aid the jury in deciding this case. Even though it will not be able to observe Broder's demeanor or have the advantage of hearing it challenged by cross-examination, the jury will be able to assess the weight of Broder's testimony by comparing it with other evidence in the case. Moreover, defendants will have an opportunity in their summations to argue that Broder's account is not credible and to emphasize the lack of confrontation and cross-examination.

### 6. *Adequate Notice*

■ Defendants argument, that the Government failed to give them adequate "notice" of its intent to introduce Broder's testimony, can be disposed of summarily. A week before trial, the Government notified defendants and the Court that it *might* use Broder's grand jury testimony at trial. Defendants have not cited a single case that stands for the proposition that a party seeking admission of evidence under Rule 804(b)(5) must provide *unequivocal* notice to its adversaries. Such a rule would serve no apparent purpose.

### CONCLUSION

For the reasons stated above, the Government's motion to admit Broder's grand jury testimony into evidence at trial is granted.

SO ORDERED.