880 P.2d 611

The STATE of Arizona, Appellee,

v.

Anthony LUZANILLA, Appellant.

No. CR–93–0166–PR.

Supreme Court of Arizona,
En Banc.

July 19, 1994.

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, Crim. Appeals, Barbara A. Jarrett and Joseph T. Maziarz, Asst. Attys. Gen., Phoenix, for appellee.

Isabel Garcia, Pima County Legal Defender, Michael S. Mussman, Former Pima County Legal Defender by Kathleen C. Dubois, Asst. Legal Defender, Tucson, for appellant.

## OPINION

MOELLER, Vice Chief Justice.

### STATEMENT OF THE CASE

Appellant Anthony Luzanilla ("Luzanilla") petitioned this court to review a court of appeals opinion which affirmed his convictions for the first degree murders of Rene Clifton and her mother, Barbara Clifton. *State v. Luzanilla,* 176 Ariz. 397, 861 P.2d 682 (App.1993). We granted review on two issues: 1) whether the principles of double jeopardy and collateral estoppel precluded the state from proceeding under a felony murder theory in Luzanilla's retrial; and 2) whether the trial court erred in admitting against Luzanilla the testimony of John Mojarro, from co-defendant Engebretson's separate earlier trial, which was received under Rule 804(b)(5) of the Arizona Rules of Evidence (the residual hearsay exception). The court of appeals ruled in favor of the state on both issues, holding that neither double jeopardy nor collateral estoppel barred the state from proceeding under a felony murder theory in the retrial, and that Mojarro's testimony from the co-defendant's trial was properly admitted under Rule 804(b)(5).

Having had oral argument, and upon review of the record, briefs, and memoranda, we agree with the court of appeals' disposition of the double jeopardy/collateral estoppel issue, 176 Ariz. at 401–03, 861 P.2d at 686–88, and now dismiss our review of that issue as improvidently granted. We disagree with the court of appeals on the issue of the admissibility of Mojarro's testimony and vacate that part of its opinion. *Id.* at 403–04,

861 P.2d at 688–89. However, because we find the error harmless, we affirm the convictions and sentences. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. § 12–120.24.

### RELEVANT FACTS

At the trial of Lee Engebretson (Luzanilla's co-defendant), John Mojarro ("Mojarro") testified that, approximately seven to ten days before the murders, Luzanilla suggested that the two of them steal victim Rene's car and kill her. Mojarro testified that he was "pretty drunk" when Luzanilla made his suggestion and that Luzanilla was only "jokin' around." For the most part, the brief cross-examination by Engebretson's attorney simply reviewed, but did not test, Mojarro's testimony.

The state subpoenaed Mojarro to testify at Luzanilla's first trial, which resulted in a partial mistrial. However, Mojarro refused to testify, even under threat of contempt of court. The trial judge, on numerous occasions, heard argument concerning the admissibility of Mojarro's testimony but refused to admit it. During Luzanilla's retrial, Mojarro was again called, and he again refused to testify. Ultimately, the trial judge, out of the presence of the jury, put Mojarro under oath, had him read his testimony from Engebretson's trial, and asked him if it was true. Mojarro said that it was. The trial judge then ruled the testimony admissible and received in evidence a transcript of the testimony under Rule 804(b)(5) of the Arizona Rules of Evidence.

### ISSUES

1) Whether admitting John Mojarro's testimony from Engebretson's trial under Rule 804(b)(5) violated Luzanilla's Sixth Amendment right to confront the witnesses against him.

2) If the testimony was inadmissible, whether the error in admitting it was harmless.

### DISCUSSION

I. Admissibility

To satisfy the confrontation clause of the Sixth Amendment, hearsay evidence not fall-

ing within a firmly rooted exception must have " 'particularized guarantees of trustworthiness' " making it "at least as reliable as evidence admitted under a firmly rooted hearsay exception." *Idaho v. Wright*, 497 U.S. 805, 814–15, 821, 110 S.Ct. 3139, 3146, 3149, 111 L.Ed.2d 638 (1990) (quoting *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980)). In determining whether such guarantees exist, courts may not consider corroborating evidence, but must instead look to "the totality of circumstances ... that surround the making of the statement and that render the declarant particularly worthy of belief." *Id.* at 819, 110 S.Ct. at 3148.

The court of appeals held that the following circumstances satisfied the particularized guarantees of trustworthiness standard: Mojarro's testimony was given under oath; Mojarro was subject to cross-examination by Engebretson's attorney; Mojarro testified concerning the things Luzanilla contends he would have explored on cross-examination; Mojarro was able to relate specifics regarding the incident; Mojarro was good friends with both Engebretson and Luzanilla and therefore had no motive to lie; Mojarro's account remained consistent; and, during Luzanilla's trial, Mojarro told the court that his testimony in Engebretson's case was true. *Luzanilla*, 176 Ariz. at 404, 861 P.2d at 689.

■ Before addressing these circumstances, we first note that the *Wright* standard of "particularized guarantees of trustworthiness" is similar to the requirements of Rule 804(b)(5). The latter speaks in terms of "circumstantial guarantees of trustworthiness" equivalent to those found in the other hearsay exceptions, whereas *Wright* requires "particularized guarantees of trustworthiness" that make the hearsay evidence "at least as reliable as evidence admitted under a firmly rooted hearsay exception." Without deciding whether the two standards are exactly the same, we hold that if the evidence does not satisfy Rule 804(b)(5), it does not satisfy the "particularized guarantees of trustworthiness" standard required by *Wright*. We therefore look to cases addressing admissibility under Rule 804(b)(5) in ana-

lyzing the circumstances relied upon by the court of appeals. We hold that these circumstances, even considered collectively, do not satisfy the requirements of the confrontation clause. Because we deal here with the confrontation clause in a criminal case, our opinion should not be construed as a blanket ruling that the circumstances relied upon by the court of appeals will never satisfy Rule 804(b)(5) in some other context. *See Wright*, 497 U.S. at 814, 110 S.Ct. at 3146 ("[t]he Confrontation Clause ... bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule.").

■ We now examine the circumstances relied upon by the court of appeals. We initially hold that the court of appeals improperly considered Mojarro's subsequent avowal that his earlier testimony was true; this is not a circumstance surrounding the earlier testimony itself and thus may not be factored into the analysis. *Wright*, 497 U.S. at 817–21, 110 S.Ct. at 3148–49.

■ The court of appeals relied on the fact that Mojarro testified under oath. But an oath alone "is an inadequate safeguard to meet the requirement ... that the statement have 'equivalent circumstantial guarantees of trustworthiness'; otherwise, Congress could have dispensed with the cross-examination requirement codified in Rule 804(b)(1)." *United States v. Fernandez*, 892 F.2d 976, 981 (11th Cir.1989), *cert. dismissed*, 495 U.S. 944, 110 S.Ct. 2201, 109 L.Ed.2d 527 (1990). In *Wright*, the Supreme Court stated that "if the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility, then the hearsay rule does not bar admission of the statement at trial." *Wright*, 497 U.S. at 820, 110 S.Ct. at 3149. The Court noted the excited utterance, dying declaration, and medical treatment exceptions as examples of the type of statements in which the truthfulness is "clear from the surrounding circumstances." *Id.* The Court stated that "evidence admitted under the [particularized guarantees of trustworthiness] requirement must similarly be so trustworthy that adversarial testing would add little to its reliability." *Id.* Giving an oath, prior to

testifying, in and of itself, is not a circumstance making it highly unlikely for a person to lie—at least so unlikely that cross-examination would add little. We agree with the Eleventh Circuit that if sworn testimony was always this reliable, there would be no need for the cross-examination requirement in Rule 804(b)(1). *Fernandez*, 892 F.2d at 981.

Likewise, the cross-examination of Mojarro by Engebretson's attorney does not satisfy Rule 804(b)(5). Engebretson was charged with the same crimes as Luzanilla. He had an obvious incentive to implicate Luzanilla and no incentive to draw out any testimony that might exculpate Luzanilla. Engebretson's attorney's motivation on cross-examination was not to take the blame off of Luzanilla. By doing so, he could have damaged his own client. The text of the cross-examination clearly demonstrates this motive; it amounted to little more than a reiteration (and exaggeration) of the direct examination.

The court of appeals' opinion also concludes that, even if Luzanilla had an opportunity to cross-examine Mojarro, he would not have elicited any additional or better information on the extent of Mojarro's intoxication or the effect of alcohol on his memory because Mojarro said he was pretty drunk at the time and was able to recall specific details, regarding the incident, at Engebretson's trial. Perhaps Luzanilla's attorney would not have been able to elicit any better testimony on these subjects. However, we can think of areas that Luzanilla's attorney might well have fruitfully explored. For instance, there was no cross-examination concerning possible bias. Luzanilla's attorney could have questioned Mojarro on the extent of his "friendship" with Luzanilla, whether there was any animosity between the two (Ali Kolahi testified that the reason Mojarro refused to testify at Luzanilla's trial was because Luzanilla had threatened him), the extent of his friendship with Engebretson, and whether he was better friends with Engebretson than with Luzanilla. Engebretson's attorney, on the other hand, had no incentive to explore these areas.

The mere fact that Mojarro was Luzanilla's friend, if it be a fact, is also not a particularized guarantee of trustworthiness. In *United States v. Lang*, 904 F.2d 618 (11th Cir.), *cert. denied*, 498 U.S. 924, 111 S.Ct. 305, 112 L.Ed.2d 258 (1990), the trial court admitted grand jury testimony of the defendant's father which implicated his son, the defendant. The government argued that the father/son relationship enhanced the trustworthiness of the statement. The court of appeals disagreed, stating that:

> Family members are no more likely than anyone else to testify truthfully about their activities or those of their relations. Indeed, there is a strong possibility that the rivalries and loyalties inherent in all families may color a family member's testimony. Given this possibility, it is particularly important that the jurors be afforded the opportunity to observe the family member making the statement and that the adverse party be afforded the opportunity to demonstrate a family member's bias.

*Id.* at 623.

The same reasoning applies to friendships, especially when one "friend" is testifying against another "friend" at yet another "friend's" trial. In such a situation, just as in the *Lang* case, there is a "strong possibility" of rivalries and loyalties that may color the testimony. Given this possibility, it is important that the adverse party have an opportunity to demonstrate possible biases or alliances. Luzanilla did not have such an opportunity.

We believe the court of appeals erred in considering the friendship between Mojarro, Luzanilla, and Engebretson for an additional reason. The court stated that "[o]ther evidence at trial established that Mojarro was good friends with both Engebretson and appellant and thus had no motive to fabricate the story." *Luzanilla*, 176 Ariz. at 404, 861 P.2d at 689. As we have already mentioned, courts may not consider "other evidence at trial" when determining whether the statement at issue contains particularized guarantees of trustworthiness. The court of appeals could properly consider only Mojarro's statement itself, and the circumstances surrounding it, in deciding that the three were "good friends" and that Mojarro "had no

motive to fabricate the story." Limiting our examination to the statement itself, we reach a different conclusion than did the court of appeals.

█ The following dialogue occurred during the direct examination of Mojarro at Engebretson's trial:

Q. Did you become good friends with these gentlemen?

A. Yeah, I guess you could say that.

Q. What type of things did you all do together?

A. Just hung around together.

Q. Did you go out partying together?

A. Yeah.

Q. How often would you see each other?

A. Every weekend, every other day.

Q. At school?

A. Yeah.

Q. At night?

A. Yeah, once in a while.

Q. When you say that you became good friends with them, what do you mean good friends?

A. I don't know, just friends, I guess, friends.

This desultory dialogue does not leave us with the impression that Mojarro had any particular allegiance to Luzanilla. We therefore cannot conclude from Mojarro's testimony that he had no motive to lie. Furthermore, exploring the extent of a friendship, and any possible bias or motive to lie, is one of the reasons *for* cross-examination. It is risky for an appellate court to make assumptions from the record in the absence of any such cross-examination.

█ The court of appeals also relied on the fact that "Mojarro's version of the incident remained consistent from the time of his statement to police to his testimony at Engebretson's trial." *Id.* We reject this rationale for two reasons. First, Mojarro's version of the incident did not remain consistent. At Engebretson's trial, Mojarro finally related a story similar to the one earlier given to police, but only after the prosecutor prodded his recollection. The prosecutor asked Mojarro:

Q. Did [Luzanilla] ever discuss with you doing anything to Rene?

A. *No, not that I can remember.* I was pretty drunk at the time.

Q. Do you recall telling Detective Kessler, back in April of '88, that [Luzanilla] would get up and say to you: Let's rip her off or kill her or something?

A. Something like that, now that you say—talk about it, yeah.

Q. Well, to the best of your recollection, why don't you tell the jury what it was that [Luzanilla] was saying?

A. [Luzanilla] was jokin' around, sayin': Let's rip off her car. *That was it.*

.      .      .      .      .

Q. So when she was stepped out of the room, he would come over and say: Come on, let's what?

A. Let's rip her off and let's kill her.

(Emphasis added.) Although this final answer is supposedly similar to the one given earlier to Detective Kessler, there appear to be two intermediate inconsistent statements: one when Mojarro told the prosecutor he could not remember Luzanilla saying anything about harming Rene, and the other when he said that Luzanilla only mentioned stealing the car.

In any event, we must reject this alleged circumstance of reliability for a second reason. The record on appeal does not contain Mojarro's initial statement to Detective Kessler or any other statement prior to his testimony at Engebretson's trial. All that was before the court of appeals were counsels' arguments on the issue and the transcript of Mojarro's testimony. While the prosecutor at Engebretson's trial purported to refresh Mojarro's memory by asking, "[d]o you recall telling Detective Kessler, back in April of '88, that [Luzanilla] would get up and say to you: Let's rip her off or kill her or something?," there is no transcript of that interview in the record. Thus, because the court of appeals did not have the various versions of Mojarro's statements before it to compare, it had no basis for stating that "Mojarro's version of the incident remained consistent."

In addition to the fact that the circumstances surrounding Mojarro's testimony fail to rise to the level of particularized guarantees of trustworthiness, we conclude that the prior testimony is not the type of evidence contemplated by Rule 804(b)(5). The Advisory Committee's Note to the federal version of Rule 803(24), which governs the residual hearsay exception when the availability of the declarant is immaterial, states that the residual exceptions "do not contemplate an unfettered exercise of judicial discretion, but they do provide for treating *new* and *presently unanticipated* situations which demonstrate a trustworthiness within the spirit of the specifically stated exceptions." Morris K. Udall et al., *Law of Evidence* 556 (3d ed. 1991) (emphasis added). The United States Senate Committee considering the new rules of evidence stated that

> [i]t is intended that the residual hearsay exceptions will· be used very rarely, and only in exceptional circumstances. The committee does not intend to establish a broad license for trial judges to admit hearsay statements that do not fall within one of the other exceptions.... The residual exceptions are not meant to authorize major judicial revisions of the hearsay rule, including its present exceptions.

*Id.* at 558. This language from the legislative history demonstrates that the drafters intended the residual exceptions to be used only in rare and exceptional circumstances.

As an example of the quality of hearsay evidence the drafters contemplated, the Senate Committee cited *Dallas County v. Commercial Union Assurance Co.*, 286 F.2d 388 (5th Cir.1961). In *Dallas County*, the clock of a county courthouse collapsed, damaging the courthouse. The county claimed that the cause of the fall was lightning that, had struck the courthouse a few days previous to the fall. Evidence of burned wood, discovered after the fall, supported this claim. The county's insurers proffered a 58–year–old newspaper account of a fire that had occurred in the clock tower during the construction of the courthouse as evidence that the burned wood was not caused by the recent lightning. The court admitted the newspaper article, although it was not found

to be admissible under any other hearsay exception, because its trustworthiness was readily apparent. The Senate Committee reported that it adopted the residual exception "[b]ecause exceptional cases like the *Dallas County* case may arise in the future...." Udall et al., *supra*, at 557.

Mojarro's testimony at Engebretson's trial was neither rare nor exceptional and is not of the type intended by the drafters of the rule on residual exceptions. *See United States v. Fernandez*, 892 F.2d 976, 982 (11th Cir.1989) ("'the ... residual exception was to be used only rarely, in truly exceptional circumstances. Corroborated grand jury testimony which for one reason or another is unavailable at trial is neither rare nor exceptional, and ... its general admission under this theory would constitute a "major revision" of the hearsay rule....'").

Some courts have held that statements which are of a type covered by one of the other exceptions, but for some reason fail to satisfy that exception's requirements, cannot be admitted under the residual exceptions. *See United States v. Vigoa*, 656 F.Supp. 1499, 1504 (D.N.J.1987); *Creamer v. General Teamsters Local Union*, 560 F.Supp. 495 (D.Del.1983). Other courts have expressly rejected this theory of inadmissibility, dubbed the "near miss" theory. *See United States v. Clarke*, 2 F.3d 81 (4th Cir.1993); *United States v. Fernandez*, 892 F.2d 976, 981 (11th Cir.1989); *United States v. Yonkers Contracting Co.*, 701 F.Supp. 431 (S.D.N.Y.1988); *In re Japanese Electronic Products*, 723 F.2d 238, 302–03 (3d Cir.1983), *rev'd on other grounds*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Language in the legislative history of the Federal Rules of Evidence suggests that the drafters intended the residual exceptions to be limited to hearsay statements not of the types covered by the other exceptions. For example, the Advisory Committee's Note uses the words "new" and "presently unanticipated," and the Senate Committee stated that the residual exceptions were not intended to emasculate the existing exceptions or authorize major revisions. Udall et al., *supra*, at 556–58. It is arguable that because former testimony was obviously anticipated by Rule

804(b)(1), it could not have been "presently unanticipated" for purposes of Rule 804(b)(5). It is likewise arguable that admitting former testimony under the residual exception would "revise" and "emasculate" Rule 804(b)(1). The former testimony exception, with its specific requirements, is of little use if we allow trial courts to bypass it and admit all kinds of former testimony under the residual exception.

Rule 804(b)(1), a firmly rooted exception, governs the admissibility of former testimony.[1] Mojarro's testimony does not fit within this exception because it lacks an essential element—Luzanilla's attorney did not have an opportunity to cross-examine Mojarro. Therefore, if the "near miss theory" is followed, the testimony should not have been admitted under Rule 804(b)(5). Notwithstanding the logical appeal of the "near miss" theory, we see no reason to either adopt it or reject it in this case. We discuss it simply to emphasize that testimony like Mojarro's— prior trial testimony—is not rare or exceptional but merely of the type generally admissible under Rule 804(b)(1) but for its missing element.

## II. Harmless Error

"A constitutional error is harmless if it can be said beyond a reasonable doubt that the error had no influence on the verdict of the jury. The question is whether the appellate court can say beyond a reasonable doubt that the jury would have found the defendant guilty without the evidence." *State v. Montes,* 136 Ariz. 491, 497, 667 P.2d 191, 197 (1983).

The state's harmless error analysis concentrates on other testimony showing defendant's state of mind, since Mojarro's testimony is arguably most damaging in that area. The state argues primarily that the testimony of witnesses King and Kolahi make the admission of Mojarro's testimony harmless. We first consider Kolahi's testimony.

■ Kolahi, one of Luzanilla's fellow inmates, testified as follows: Luzanilla told him that Engebretson was depressed about his relationship with Rene and wanted to kill her and that Luzanilla said, "why don't you just kill the bitch." Luzanilla knew of Engebretson's feelings and intent to kill before going over to the house, and that Engebretson had a gun. Luzanilla did not expect it to happen but wanted to see how far it would go. Engebretson showed Luzanilla the gun. At one time Luzanilla told Kolahi that he was not aware of the shootings because he had headphones on in another room. Another time Luzanilla told Kolahi that he did not have headphones on and heard the gunshots, but when he went to see what was happening, it was too late. Luzanilla did not tell Kolahi that he shot and killed the two women.

Although Kolahi's testimony puts Luzanilla at the scene with perhaps some indication that Engebretson wanted to kill Rene, it tends to support the defense theory that Engebretson was the perpetrator. Thus, Kolahi's testimony alone is not enough to convince us that Mojarro's testimony was harmless error.

■ But the state also points to King's testimony. King testified as follows: sometime during the early hours of the morning after the killings, Luzanilla came to his house and woke him up by knocking on his window. Luzanilla was by himself, and King let him into the house. Luzanilla told King that he was in trouble and that "[m]e and Lee killed these two chicks." Luzanilla said that Engebretson and Rene were arguing and that Engebretson told him to shoot Rene. Luzanilla said that he did not shoot at first, but Engebretson kept telling him to shoot, and he finally pulled the trigger and shot Rene. Rene's mom then came into the room, and he shot her too. Luzanilla said that he shot the women in the head. While Luzanilla was telling him all of this in King's bedroom, Engebretson was waiting out in the car. Luzanilla asked King for money and clothes because he was going to try to run to California. After Luzanilla returned from California to Tucson, he had another conversation with King in which he told King not to say

---

1. We note that Rule 19.3(c) of the Rules of Criminal Procedure also governs the admissibility of prior recorded testimony. Neither the parties nor the court of appeals addressed this rule, and we therefore do not discuss the relationship between it and Rules 804(b)(1) and 804(b)(5).

anything about their first conversation. King initially interpreted this as a request to lie for Luzanilla. Luzanilla also asked King not to testify against him. King also testified that when Luzanilla came back to town, he changed his story and told King that Engebretson had done the shootings.

Luzanilla verified King's testimony during the cross-examination of his own testimony: he stated, "I told him exactly what he told you." However, he maintained that his later story that Engebretson had killed the victims was the truth. He explained that he initially told King that he did it because "if I would have told him Lee did it, I don't think he would have gave me money." Luzanilla also testified that the reason he asked King not to tell anyone about his initial visit was because he thought King might get in trouble for helping them, and he wanted to protect his friend.

Luzanilla's explanations are incredible. His reason for putting the blame on himself does not make sense in light of King's testimony. Luzanilla told King that he *and Engebretson* had just killed two women and that he was the gunman. Telling King that Engebretson was involved and was the one who persuaded him to pull the trigger does not comport with Luzanilla's alleged concern about King not giving him money. Luzanilla's explanation about why he told King not to mention their first conversation is similarly devoid of credibility. After returning from California, Luzanilla told King that Engebretson was the one who killed the victims. The self-serving nature of this statement, as well as his request that King not mention the first visit or testify against him, is readily apparent. King himself testified that he initially interpreted Luzanilla's request as a request to lie.

Luzanilla testified at length at trial. From its verdict, it is clear the jury rejected his explanation of events, including his explanation of his statements to King. Given that Luzanilla himself verified that he made the statements, we consider King's testimony as credible evidence of Luzanilla's state of mind, sufficient in itself to support the jury's verdict. Unlike Mojarro's testimony, it recounted Luzanilla's admission to the very crimes for which he was tried.

Besides King's testimony, there is other evidence linking Luzanilla to these crimes and the crime scene. Prior to his trial testimony, Randy Scott stated that Engebretson and Luzanilla talked about doing a "threesome" all the time. Scott also stated on at least one prior occasion that the two asked him to drive them over to Rene's and that they told him that they were going to pull a threesome. Scott also agreed with his earlier statement that Luzanilla told him that Luzanilla saw Engebretson pry bullets out of the glove compartment of Scott's truck.

The medical examiner testified that Barbara Clifton was killed by a bullet shot from a gun within a few inches of her head or less, and that Rene Clifton was shot at contact range. Although this testimony does not prove who pulled the trigger, it lends physical support to Luzanilla's first account of the murders to King.

Officer Kessler testified that Engebretson told him that he was arguing with Rene and that Luzanilla produced a pistol and shot her and then shot the mother when she came into the room. Although this statement is self-serving—Engebretson pinning the blame on Luzanilla—it is similar to the one made by Luzanilla to King.

There was also testimony from another witness similar to Mojarro's testimony. The prosecutor questioned Bernadino Martinez about prior statements he had made regarding a conversation with Luzanilla three or four days before the murders. Martinez was a hostile witness and denied making, or could not recall, most of his previous statements. However, he did testify that he was not lying when he made his prior statements. According to Martinez's prior statements, Luzanilla talked about "easy money" and how they could make money by selling Rene's car, stereo, and tapes. Luzanilla said that it would be easy, that they could get her keys and sell her car for $3,000. Luzanilla suggested that they take the property to San Diego because he has relatives there, and he kept trying to convince Martinez to go to California. Luzanilla said he could take her

keys while she was sleeping and sell the property before she could call the police.

Luzanilla's sister Veronica testified that John Mojarro told her that Engebretson admitted committing the murders. However, the prosecutor pointed out on cross-examination that in her prior statement, she stated that Mojarro told her that "*they* came and seen me that night, ... [a]nd Lee was saying something about that *they* killed somebody ...," and that she wanted "to know who it was that *they* killed." (Emphasis added.)

Considering King's testimony and all the other evidence presented at the second trial, we hold that the erroneous receipt of Mojarro's testimony was harmless.

## DISPOSITION

We agree with the court of appeals' conclusion on the double jeopardy/collateral estoppel issue and, therefore, dismiss that portion of the petition to review (Question 1 of the petition) as improvidently granted. We conclude that the trial court erred in receiving Mojarro's testimony as an exception under Rule 804(b)(5) and vacate the portion of the court of appeals' opinion that deals with that issue. Because we conclude the error was harmless, we affirm defendant's convictions and sentences.

FELDMAN, C.J., and CORCORAN, ZLAKET and MARTONE, JJ., concur.