924 P.2d 497

**STATE of Arizona, Appellee,**

v.

**Ignacio Gonzalez VALENCIA, Appellant.**

**No. 1 CA–CR 95–0247.**

Court of Appeals of Arizona,
Division 1, Department C.

April 4, 1996.

Redesignated as Opinion and
Corrected May 2, 1996.

Review Denied Sept. 24, 1996.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, and Joseph T. Maziarz, Assistant Attorney General, Phoenix, for Appellee.

Dean W. Trebesch, Maricopa County Public Defender by Carol A. Carrigan, Deputy Public Defender, Phoenix, for Appellant.

## OPINION

SULT, Judge.

Ignacio Gonzalez Valencia ("defendant") appeals from his convictions and sentences on one count of aggravated assault, a class three dangerous felony, and two counts of first degree murder, class one dangerous felonies.[1] For the reasons that follow, we affirm defendant's convictions and sentences.

## FACTS AND PROCEDURAL HISTORY

We view the facts in the light most favorable to sustaining the convictions with all reasonable inferences resolved against the defendant. *State v. Guerra,* 161 Ariz. 289, 293, 778 P.2d 1185, 1189 (1989). The relevant facts are as follows. During the early morning hours of February 21, 1993, defendant was at a party drinking beer with a

1. Valencia was a juvenile at the time of the shootings but was tried as an adult.

group of people which included gang members and other juveniles. At that time, defendant was associated with at least two gangs, the "Los Marcos Homeboys" and the "Los Cuarto Milpas." Also attending the party were Sammy Baldonado, his girlfriend, Sunshine Azule, and his good friend, John Randles. Randles was a former member of Los Marcos Homeboys and knew defendant. Sunshine had never met defendant, but someone pointed him out to her at the party.

Eventually the beer supply ran low and defendant suggested stealing more beer. Sammy refused to participate in stealing beer and several people began taunting him, stating that he was "not down for his race" and a "punk." Defendant asked, "Who's not down for this," and punched Sammy in the face. Sammy did not respond and defendant pulled out a handgun and pointed it at Sammy's head. Randles was standing beside Sammy and Sunshine was about five feet away. Both had a clear view of defendant. As defendant was firing the gun, someone named "Victor" pushed defendant's arm down and the bullet struck Sammy in the chest. Defendant ran before the paramedics and police arrived.

Although the bullet passed through Sammy's chest and exited his back, emergency surgery spared his life. Sammy had known defendant by the name of "Nacho Valencia," and while in the hospital, he told his mother that Nacho Valencia shot him. Also at the hospital, the day after the shooting, police detectives showed Sammy two photographic line-ups, one of which included a picture of defendant. Sammy identified defendant as the person who shot him, naming him as Nacho Valencia. Sammy spent almost two weeks in the hospital and after discharge, stayed with his aunt, Stella Reyes, for about a month prior to returning to his parents' house.

On the evening of July 22, 1993, defendant and his cousin, Hector Valencia, were driving around in Hector's car, both armed with handguns. With them in the back seat were Antonio Faz, Victor Gomez, and Jimmy DeLeon. Hector drove to Sammy's house and he and defendant walked up to the house and knocked on the door. When Sammy and his stepfather answered, Hector said, "Do you remember me?" Hector and defendant then opened fire and Sammy was shot in the left chest, left hip, and left forearm. His stepfather was shot through his right upper arm and into his chest and in the back of his head through the brain. After the gunshots, Sammy's aunt Stella ran out the door and saw two hispanic men running away. Defendant and Hector drove off in a dark Monte Carlo with three people in the back seat, and, as Faz was later to describe, both laughed and joked about the shootings.

Defendant and his companions continued to drive around until a patrol car spotted and followed them. After a short chase, Hector's car struck a curb, blowing out two tires, and came to rest in the front yard of a house. DeLeon and Gomez were immediately arrested but the others escaped. The police set up a perimeter around the disabled vehicle and by early the next morning defendant was arrested within this perimeter. Faz was apprehended at his home later in the day. Although defendant and Hector had threatened to kill anyone who talked to the police, Faz gave a detailed account of the events leading up to and following the killings.

Sammy's stepfather died immediately from his wounds. Sammy lingered for twenty days before dying on August 10, 1993. Two days after the shooting, while in intensive care, Sammy told a detective that defendant shot him and that defendant's cousin was involved. The detective presented a photographic line-up to Sammy and Sammy identified defendant as his assailant.

Defendant was placed in juvenile detention pending a transfer hearing. Defendant's probation officer met with him several times to explain the transfer process and to see if he needed anything. She had previously told defendant not to discuss the case with her, only his attorney. Nonetheless, during a visit, defendant asked the probation officer what she thought would happen at the transfer hearing. She told defendant if probable cause was found he most likely would be tried as an adult. Defendant then said, "I admit I shot him the first time, but I wasn't even there the second time. I didn't shoot him and they picked me up afterwards."

While in the juvenile housing unit, defendant attempted to send letters soliciting false testimony from his friends and encouraging them to silence adverse witnesses.

Pursuant to a warrant, Hector Valencia's car was searched. The search produced documents with Hector's name and also revealed fingerprints of defendant, Hector, and Victor Gomez. Additional investigation disclosed that five shots were fired at Sammy and his stepfather on July 22 and that four of them were from the same gun. One gun fired three bullets into Sammy and one bullet into the stepfather, while the other gun fired a bullet through the brain of the stepfather.

In December, prior to trial, defendant's counsel became aware of a possible defense witness, one Esperanza. Apparently Esperanza had legal problems of his own and had retained Gene Stratford as his attorney. On December 23, defendant's counsel sent a letter to Mr. Stratford asking him whether Esperanza could provide defendant with any information regarding defendant's charges. Defendant's counsel then waited until January 26, eight days after defendant's trial started and just as the state was about to rest, to follow up the letter by making actual contact with Mr. Stratford. Counsel received permission from Stratford to talk to Esperanza and did so the next day. Esperanza alleged that he had learned from Sammy that Sammy did not have first hand knowledge regarding who shot him in February because he was too intoxicated at that time.

On Sunday evening, January 29, defendant's counsel advised counsel for the state of Esperanza's existence, his proposed testimony, and that the defense would call Esperanza as a witness. The next day at an informal conference with the court, the state objected to Esperanza testifying. The trial court agreed with the state and precluded the defense from calling Esperanza as a witness.

Following the jury trial, defendant was convicted and sentenced on one count of aggravated assault for shooting Sammy in February and two counts of first degree murder for shooting Sammy and his stepfather in

July. Defendant timely appealed raising three issues:

1. Did the trial court commit reversible error by admitting the victim's February and July out of court statements identifying defendant?

2. Did the trial court commit reversible error by precluding the testimony of Esperanza?

3. Did the trial court commit reversible error by admitting defendant's statement to the juvenile Probation Officer?

## DISCUSSION

**I. The Trial Court Did Not Err By Admitting Sammy's February And July Out Of Court Statements Identifying Defendant.**

Defendant argues that the admission of these statements constituted reversible error because: (1) the statements were inadmissible hearsay, and (2) the statements violated his Sixth Amendment right to confrontation. The state argues that the statements were admissible under the residual hearsay exception, that they did not offend defendant's Sixth Amendment rights, and that in any event, defendant waived his hearsay and Confrontation Clause objections by killing Sammy.

### A. Hearsay Analysis

■ Generally, out of court statements offered in evidence to prove the truth of the matters asserted in the statements are inadmissible. Ariz.R.Evid. 801(c), 802. However, excluding all hearsay evidence is not practical and courts have developed a number of exceptions to the hearsay rule. Morris K. Udall et al., *Arizona Practice—Law of Evidence* § 126 at 265–66 (3rd ed. 1991). In addition to the traditional exceptions, courts have also created the residual hearsay exception that is more general than the traditional exceptions. *Id.* § 136 at 302; *see also* Ariz. R.Evid. 803(24), 804(b)(5).

■ To be admissible under the residual hearsay exception, the declarant must be unavailable and his out of court statement must have circumstantial guarantees of trustwor-

thiness equivalent to the traditional exceptions. Ariz.R.Evid. 804(b)(5); *see also Idaho v. Wright*, 497 U.S. 805, 815, 110 S.Ct. 3139, 3146, 111 L.Ed.2d 638 (1990); *State v. Luzanilla*, 179 Ariz. 391, 393–94, 880 P.2d 611, 613–14 (1994). In making the determination of whether a particular statement contains sufficient guarantees of trustworthiness, the trial court must consider "the totality of circumstances .... that surround the making of the statement and render the declarant particularly worthy of belief." *Luzanilla*, 179 Ariz. at 394, 880 P.2d at 614 (quoting *Wright*, 497 U.S. at 819, 110 S.Ct. at 3148.) A trial court may also consider corroborating evidence as part of the totality of circumstances in determining whether sufficient guarantees of trustworthiness exist. *See id.*, 179 Ariz. at 394, 880 P.2d at 614 (quoting *Wright*, 497 U.S. at 814, 110 S.Ct. at 3145.) Factors a trial court should consider include such things as "spontaneity," "consistent repetition," "the mental state of the declarant," and "lack of motive to fabricate." *Wright*, 497 U.S. at 821–22, 110 S.Ct. at 3149–50; *State v. Ruelas*, 174 Ariz. 37, 40, 846 P.2d 850, 853 (App.1992). The trial court's determination of these issues will not be disturbed on appeal absent a clear abuse of discretion.

### B. Confrontation Clause Analysis

■ The Sixth Amendment guarantee of a defendant's right to confrontation places limits on the admissability of hearsay. With respect to most hearsay exceptions, the Supreme Court has said that the indicia of reliability mandated by the Confrontation Clause "can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception." *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980); Udall, *supra* § 138 at 311. Hearsay otherwise admissible under the residual hearsay exception, however, may not satisfy a Sixth Amendment analysis. While both analyses call for an examination of the totality of the circumstances, the difference is that in the context of a Sixth Amendment challenge, the circumstances which may be examined are limited to those that surround the making of the statement and do not include other evidence which may corroborate the truth of the statement.

*Wright*, 497 U.S. at 819, 110 S.Ct. at 3148; Udall, *supra* § 138 at 311.

### C. Waiver By Misconduct Analysis

■ If a defendant silences a witness by violence or murder, the defendant cannot then assert his Confrontation Clause rights in order to prevent the admission of prior testimony from that witness. *United States v. Thai*, 29 F.3d 785, 814 (2nd Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 456, 130 L.Ed.2d 364 and — U.S. —, 115 S.Ct. 496, 130 L.Ed.2d 406 (1994); *United States v. Mastrangelo*, 693 F.2d 269, 272–73 (2nd Cir. 1982); *see also Snyder v. Massachusetts*, 291 U.S. 97, 106, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934) (noting that the Sixth Amendment right of confrontation may be waived by misconduct). In such circumstances, a defendant is deemed to have waived both his Confrontation Clause *and* his hearsay objections to the admission of the witness's statements. *Thai*, 29 F.3d at 814; *Mastrangelo*, 693 F.2d at 272–73; *see also United States v. Potamitis*, 739 F.2d 784, 789 (2nd Cir.), *cert. denied*, 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 and 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 269 (1984). Prior to admitting testimony pursuant to this principle, the trial court must hold a hearing at which the government has the burden of proving by a preponderance of the evidence that the defendant was responsible for the witness's absence. *Thai*, 29 F.3d at 814; *Mastrangelo*, 693 F.2d at 273; *United States v. Aguiar*, 975 F.2d 45, 47 (2nd Cir.1992).

### D. Admissibility of Sammy's February Statement Identifying Defendant

■ Defendant asserts that the February statement does not qualify for admission under the residual hearsay exception. However, we agree with the contrary ruling of Judge Thomas O'Toole, who handled this matter at the pretrial stage and find that his analysis is supported by the record and adopt it as our own:

At approximately 3:50 a.m., February 21, 1993, Sammy Baldonado was shot in the chest from a distance of three or four feet. He was rushed to Good Samaritan Hospital emergency room in serious condi-

tion. He then underwent emergency chest surgery, following which he was placed in the Intensive Care Unit in critical condition. He was intubated in the nose and mouth and medicated. After regaining consciousness, he told his mother that the Defendant, who is also known as "Nacho", was his assailant. She then called and informed the police. Detective Meislish immediately prepared a photo spread to be shown to Sammy which included the photograph of "Nacho" *Romero.* When this spread was shown to Sammy Baldonado, he immediately explained that Nacho Romero was at the party but that "Little Nacho" (the Defendant, Ignacio Valencia) was his assailant. A second photo lineup was prepared with the Defendant's photograph included. On February 22, 1993, when shown this photo spread by Detective Lewis, Sammy Baldonado immediately identified the Defendant as his assailant.

The totality of the circumstances surrounding Sammy Baldonado's hearsay identification of the Defendant as his assailant establishes that this identification has particularized guarantees of trustworthiness sufficient to render the Defendant's exercise of his rights of confrontation and cross-examination unnecessary. Rule 804(b)(5), Arizona Rules of Evidence; *Idaho v. Wright,* 497 U.S. 805, 813 [110 S.Ct. 3139, 3145, 111 L.Ed.2d 638] (1990); *State v. Ruelas,* 174 Ariz. 37, 39–43 [846 P.2d 850] (App.1993). This testimony is more probative on the crucial issue of the identity of his assailant than other evidence the State has or could obtain through reasonable efforts. Other eyewitnesses have given conflicting statements regarding who shot the victim, and one eyewitness cannot be located even though he is a resident of Phoenix. Rule 804(b)(5). The victim just had major chest surgery and was in critical condition at the Good Samaritan Intensive Care Unit when he identified the Defendant. He had tubes down his throat, was on pain medication and was only able to talk in a whisper and by shaking his head. He quickly, repeatedly and spontaneously identified the Defendant as his assailant, and did not hesitate in clarifying to the police the correct identity of the assailant.

Contrary to the Defendant's contention, the victim had no motive to lie or fabricate his identification of the Defendant. Although the victim and the Defendant were members of different gangs, they were partying together when the incident occurred and the shooting had nothing to do with gang rivalries or activity. The only evidence of bad feelings between the victim and the Defendant points to the Defendant being angry at the victim, not vice versa. The Defendant apparently had it in for the victim because he and his cousin didn't like Sammy for unstated reasons and had threatened to jump him. In addition, the Defendant was also angry with and shot the victim, who was on probation, because he refused to go on a "beer run" with the Defendant that night and thereby violate his probation. Under the circumstances, the Court cannot conclude that there exists any credible evidence that the victim had any motive to fabricate his identification of the Defendant while hospitalized in critical condition following surgery at Good Samaritan Hospital.

We also agree with and adopt Judge O'Toole's finding that defendant waived hearsay and Confrontation Clause objections to the February statement:

The Court finds by clear and convincing evidence that the State has shown that the Defendant murdered the victim Sammy Baldonado on July 23, 1993 in order to silence him regarding the February 21, 1993 assault by the Defendant. Reliable hearsay, otherwise not admissible at a jury trial, establishes that this happened. In particular, Detective Meislish has testified that on May 25, 1993, during an investigative interview regarding the February 21, 1993 shooting, Sammy Baldonado told him that approximately two weeks earlier the Defendant, brandishing a gun, had threatened to harm him if he cooperated with police regarding that shooting. In addition, Antonio Faz gave a detailed tape recorded statement to the police on July 22, 1993, the day after the shooting, that he was with the Defendant and his cousin

**500**

when they shot and killed Sammy Baldonado and his father, Brigido Tovar. However, Faz, when confronted by the glaring Defendant [in the pretrial proceedings in ... this case], suffered a "convenient" loss of memory which the Court found was feigned. Finally, undisputed evidence also shows that, at the October 6, 1993 Juvenile Transfer Hearing, the Defendant threatened and tried to intimidate John Randles, an eyewitness to the February 21, 1993 shooting, by pulling his hand across his throat when Randles testified. Based on this pattern of intimidation, the Court finds that the Defendant has waived his right to raise any hearsay or confrontation objections to the admission to Sammy Baldonado's February 21, 1993 and February 22, 1993 statements identifying him as the assailant regarding the aggravated assault that occurred on February 21, 1993.

 Defendant asserts that waiver cannot be found since to do so requires the trial judge to find that defendant killed Sammy to silence him. This, defendant argues, is the ultimate fact in issue. If the trial judge is permitted to make such a finding, then he has usurped the function of the jury.

In so arguing, defendant overlooks Rule 104(a) of the Arizona Rules of Evidence. This rule requires the trial judge to make such factual findings in determining as a preliminary matter the admissibility of evidence: *State v. White,* 168 Ariz. 500, 505, 815 P.2d 869, 874 (1991). Such findings are not made known to the jury and do not usurp the jury's function. *Id.* The trial court's factual findings are fully supported by the record and its legal determinations are in accord with applicable precedent. We therefore find that the trial court's decision to admit Sammy's February statement was not error.

### E. Admissibility of Sammy's July Statements Identifying Defendant

The trial court admitted the July statement under the residual hearsay exception clause and as a dying declaration. The court did not make any finding on the issue of whether defendant waived by misconduct any objection to this statement.

 We disagree that the statement was a dying declaration under Rule 804(b)(2) of the Arizona Rules of Evidence. This rule requires, *inter alia,* that the statement be made by a declarant while believing death to be imminent. This sense of impending death can be shown "either by express language or by circumstances which compel the conclusion that the declarant believed he was dying." *Ruelas,* 174 Ariz. at 42, 846 P.2d at 855. The record here is clear that Sammy never expressed a belief that he was dying, nor did the trial court so find. Rather, the trial court concluded that because Sammy's mother was told by the physician that Sammy was going to die and because Sammy's physician believed he would die that Sammy must have also known this. We do not find that these circumstances "compel" the conclusion that Sammy believed he would die and, therefore, reject the finding that his statement was admissible as a dying declaration.

 We do, however, agree with the trial court that the statement was admissible under the residual hearsay clause and not barred by the Confrontation Clause since testing it by cross-examination would have been of marginal utility. *Wright,* 497 U.S. at 820, 110 S.Ct. at 3149. The trial court found as follows:

> The Court also finds that the victim's July 24, 1993 statements are admissible under the residual hearsay exception, Rule 804(b)(5), Arizona Rules of Evidence. The [victim] was in grave physical condition, knew the Defendant from past contacts, had no motive to fabricate, and immediately and unequivocally identified the [defendant]. *The statement itself and the circumstances surrounding the statement ... have sufficient particularized guarantees of trustworthiness so that confrontation and cross-examination of the victim regarding the identification would be of minimal value to the Defendant.* Finally, like the victim's February 21, 1993 statements identifying the Defendant, this evidence is more probative on the critical issue of the identity of his assailant than other evidence the State has or could ob-

tain through reasonable efforts. Rule 804(b)(5).

(Emphasis added.) We find the trial court's decision to admit Sammy's July statements was not error.

## II. The Trial Court's Decision To Preclude Esperanza's Testimony Is Not Reversible Error.

Defendant's second claim is that the trial court committed reversible error when it precluded the testimony of Esperanza. Esperanza's testimony was intended to impeach Sammy's identification of defendant by introducing an alleged prior inconsistent statement by Sammy. Defendant claims that Esperanza would have testified that he learned from Sammy that Sammy was too intoxicated in February to know who shot him. The state objected to Esperanza testifying, asserting that he was not timely disclosed and that his proposed testimony was inadmissible hearsay. The trial court precluded Esperanza's testimony based on the late disclosure.

On appeal, defendant attacks the witness preclusion ruling only on the late disclosure basis. The state asserts that, since the trial court also precluded Esperanza's testimony on the alternative ground of hearsay, defendant's failure to address this basis constitutes a waiver of the preclusion ruling on appeal. Our review of the record does not support the state' position. We do not find that the

trial court ever ruled on the hearsay issue and, therefore, no waiver has occurred.[2]

The state first urges that we uphold the trial court's ruling on the alternative ground that the proposed testimony was inadmissible hearsay. The state relies on Rule 801(d)(1) of the Arizona Rules of Evidence as prohibiting admission of a prior inconsistent statement to impeach a declarant who does not testify at trial. Since Sammy did not testify, the state reasons, Esperanza's testimony was inadmissible anyway. This argument overlooks Rule 806.[3] This rule specifically permits impeachment of a hearsay statement made by an absent declarant by any means which would have been permissible had the declarant been present and testified. *State v. Owen,* 101 Ariz. 156, 158, 416 P.2d 589, 591 (1966) *cert. denied,* 388 U.S. 915, 87 S.Ct. 2128, 18 L.Ed.2d 1356 (1967). Pursuant to this rule, Esperanza's testimony was admissible to impeach Sammy's hearsay identification of defendant as the February assailant.

We now turn to whether the trial court erred by precluding Esperanza's testimony because of the late disclosure. Rule 15.7 of the Arizona Rules of Criminal Procedure addresses the sanctions that can be imposed for discovery violations and provides in pertinent part:

2. Regarding preclusion of Esperanza's testimony, the trial court made the following ruling:
 The Court: Okay. Since the Court hasn't previously placed this on the record before, the Court has informally told counsel that it would not permit Mr. Esperanza to testify to the matter—which counsel indicated his testimony would pertain to, *primarily due to the late disclosure* which as counsel pointed out, this Court was advised of—was it yesterday—
 [Appellant's Counsel]: That's correct.
 The Court: —for the first time, and which was simply a couple of hours before the State was resting its case.
 *In regard to the impeachment evidence that it may have imported, since I've been presented no cases, I'm a little less certain as to whether or not it would be admissible, had a person been noticed earlier or not....*

 . . . . .

 The Court: Yeah. And the argument here is that one should be able to impeach a person when their hearsay comes in to the same ex-

tent as if that person were here on the witness stand and capable of being impeached with a prior inconsistent statement.
 *Frankly, I don't know—I don't know the answer to that.* But, at this time, I'm ruling that his testimony on that—which this would only pertain to as the aggravated assault, is not admissible, and, as a result, I understand you're not calling him?
 [Appellant's Counsel]: That's correct.
 (Emphasis added.)

3. Rule 806 provides in pertinent part: "When a hearsay statement ... has been admitted in evidence, the credibility of the declarant may be attacked ... by any evidence which would be admissible for those purposes if declarant had testified as a witness."

[T]he court may impose any sanction which it finds just under the circumstances, including, but not limited to:

(1) Ordering disclosure of the information not previously disclosed.

(2) Granting a continuance.

(3) Holding a witness, party, or counsel in contempt.

(4) Precluding a party from calling a witness, offering evidence, or raising a defense not disclosed; and

(5) Declaring a mistrial when necessary to prevent a miscarriage of justice.

Although preclusion is a listed sanction, it impinges on a defendant's Sixth Amendment right to present witnesses in his own defense. *Taylor v. Illinois*, 484 U.S. 400, 411–15, 108 S.Ct. 646, 654–56, 98 L.Ed.2d 798 (1988); *State v. Delgado*, 174 Ariz. 252, 257, 848 P.2d 337, 342 (App.1993). Consequently, preclusion is rarely an appropriate sanction for a discovery violation and should be used only as a last resort. *Delgado*, 174 Ariz. at 257, 848 P.2d at 342.

Normally, we would review the trial court's exercise of its discretion in light of the factors set forth in *State v. (Joe U.) Smith*, 140 Ariz. 355, 359, 681 P.2d 1374, 1378 (1984).[4] However, an analysis of the very first of those factors, namely, how vital was the evidence precluded, clearly illustrates that the error, if any, in the trial court's ruling was harmless beyond a reasonable doubt. *See State v. Williams*, 133 Ariz. 220, 225, 650 P.2d 1202, 1207 (1982).

We first note that Esperanza's testimony related solely to the February aggravated assault and was not relevant at all to the two murder charges. Therefore, his preclusion could not have directly impacted the murder convictions. As for the aggravated assault charge, we find the preclusion harmless due to the overwhelming evidence of defendant's

guilt on that charge. Two eyewitnesses other than Sammy identified defendant as the person who shot Sammy in February. Perhaps most persuasive, defendant admitted to his probation officer that he did shoot Sammy in February. Finally, strong evidence existed that defendant used intimidation and murder to silence or attempt to silence witnesses to the February incident, showing a strong consciousness of guilt. We find the evidence of defendant's guilt of the aggravated assault charge so overwhelming that there is no reasonable probability that the verdict on this charge would have been different had Esperanza's testimony been admitted. *See State v. McVay*, 127 Ariz. 450, 453, 622 P.2d 9, 12 (1980). We therefore find the trial court's decision to preclude Esperanza's testimony was not reversible error.

### III. The Trial Court Did Not Err By Admitting Defendant's Volunteered Statements To His Juvenile Probation Officer.

Defendant's third claim is that his statement to the probation officer was inadmissible because he was not given any Miranda warnings prior to his making the statement. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); R.P.Juv.Ct. 7. When a person is in custody and subject to "interrogation" by law enforcement officers he must be advised of his Fifth Amendment rights. *E.g., State v. Rivera*, 152 Ariz. 507, 513, 733 P.2d 1090, 1096 (1987). However, a conversation initiated voluntarily by a defendant does not constitute "custodial interrogation," *State v. Mauro*, 159 Ariz. 186, 192, 766 P.2d 59, 65 (1988), and a spontaneous statement not made in response to interrogation does not violate *Miranda*, *State v. Carter*, 145 Ariz. 101, 106, 700 P.2d 488, 493 (1985).

In this case, defendant's juvenile probation officer was merely providing routine services

---

**4.** Were we to do so, we would be compelled to comment on the trial court's failure to address the *(Joe U.) Smith* factors on the record so as to permit this court access to the unique perspective that a trial court has in such situations. For example, we wonder why the trial court did not attempt a less drastic sanction, such as a short trial continuance, which would have permitted the state to interview the witness. Such an interview might have ameliorated the surprise factor

the state complained of and also given the trial court the opportunity either to find irremediable prejudice to the state or be satisfied that no such prejudice would occur from letting the witness testify. If, however, the trial court had some cogent reasons for not following this procedure, and had made those reasons clear on the record, this court would be in a much better position to uphold the trial court's exercise of its discretion.

to a detained probationer and had told defendant she did not want to discuss the charges and he was not to tell her anything about it. Nonetheless, defendant asked the probation officer what she thought would happen in the upcoming transfer hearing and what her "recommendation was." She told defendant "if the judge found probable cause, he would probably be transferred," and he then stated: "I admit I shot him the first time, but I wasn't even there the second time. I did not shoot him. They picked me up afterwards." It is clear the defendant initiated the conversation on the topic of the charges and that his incriminating statement was spontaneous and not the product of any interrogation by the probation officer. We therefore find the trial court was correct in admitting the statement.

## CONCLUSION

The trial court committed no error in admitting either of the out of court statements of the victim or in admitting the statement of the defendant to the juvenile probation officer. If the trial court did err in precluding witness Esperanza from testifying, it was harmless error. We therefore affirm the judgments of conviction and sentences imposed thereon.

FIDEL, P.J., and LANKFORD, J., concur.