NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

WADE EUGENE BRADFORD, *Appellant.*

No. 1 CA-CR 15-0515
FILED 1-17-2017

Appeal from the Superior Court in Maricopa County
No.  CR2010-048445-001
The Honorable M. Scott McCoy, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joseph T. Maziarz
*Counsel for Appellee*

The Hopkins Law Office PC, Tucson
By Cedric Martin Hopkins
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Presiding Judge Kenton D. Jones delivered the decision of the Court, in which Judge Randall M. Howe and Judge Donn Kessler joined.

---

**J O N E S**, Judge:

**¶1**    Wade Bradford appeals his convictions and sentences for one count each of first degree murder and aggravated assault.  After searching the entire record, Bradford's defense counsel has identified no arguable question of law that is not frivolous.  Therefore, in accordance with *Anders v. California*, 386 U.S. 738 (1967), and *State v. Leon*, 104 Ariz. 297 (1969), defense counsel asks this Court to search the record for fundamental error. Bradford was afforded an opportunity to file a supplemental brief *in propria persona* but declined to do so.  After reviewing the record, we find no error. Accordingly, Bradford's convictions and sentences are affirmed.

## FACTS[1] AND PROCEDURAL HISTORY

**¶2**    In early 2010, Natalie A. began a romantic relationship with Kevin M., and the two moved in together.  In April 2010, Natalie admitted she still had feelings for her ex-boyfriend, Bradford, with whom she had an on-again, off-again relationship since January 2009.  Bradford thereafter confessed his love for Natalie and desire to marry her and gave her an ultimatum to decide between him and Kevin.  On May 22, 2010, Bradford picked up Natalie and her belongings from the home she shared with Kevin, after which the two traveled together out-of-state.

**¶3**    When Natalie returned to Arizona on May 28, 2010, she reinitiated her relationship with Kevin.  Bradford called and told Kevin "don't ruin this for me," but Kevin cursed at Bradford and warned him to keep his distance or Kevin would "kick his ass."  Nonetheless, when Kevin and Natalie went to the hotel where Bradford was staying so Natalie could

---

[1]    We view the facts in the light most favorable to sustaining the jury's verdicts, with all reasonable inferences resolved against the defendant. *State v. Harm*, 236 Ariz. 402, 404 n.2, ¶ 2 (App. 2015) (quoting *State v. Valencia*, 186 Ariz. 493, 495 (App. 1996)).

pick up some of her belongings, Kevin parked around the corner and waited outside to avoid a confrontation.

¶4        The following day, Natalie arranged with Bradford to retrieve the remainder of her belongings.  Kevin and Natalie drove separate cars to a condominium in Tempe that was owned by Bradford and used to operate his massage business.  Kevin and Natalie arrived out front shortly after 9:00 p.m.  When no one responded at the front door, Natalie called Bradford, who advised he was on his way.  Bradford appeared from around the corner, saw Kevin and Natalie, pointed to the back, and directed them to the garage.  Bradford entered the front door of the condo, and Kevin and Natalie moved their cars into the alley, closer to the garage.

¶5        After a few more minutes, the garage door opened, and Natalie walked toward her belongings, which were stacked against the wall in the otherwise empty two-car garage.  Bradford entered the garage from a door leading inside the condo and approached Natalie as if to help her.  Meanwhile, Kevin walked to his car to get a suitcase.

¶6        According to Kevin, when he returned with the suitcase, he saw Bradford turn toward Natalie, lift his right hand to point a gun at the back of her head, and pull the trigger.  Bradford then turned the gun toward Kevin.  Kevin tried to run away but dropped the suitcase, tripped, scraped his leg, and fell in the bushes nearby.  Bradford chased Kevin around the corner, found him face down in the bushes, pointed the gun at his head, and said "stay down."  Bradford then lowered the gun, turned, and walked down the alley adjacent to the garage.

¶7        Kevin immediately called 9-1-1.  When police officers responded at approximately 9:20 p.m., Kevin flagged them down, exclaimed, "She's dead.  He fucking shot her in the back of the head," and pointed to a nearby garage.  Inside, the officers found Natalie's body lying face up with blood coming from her head and mouth.  She was pronounced dead at the scene.

¶8        The suitcase Kevin dropped was found outside adjacent to an area of landscaping that appeared to have been trampled.  A zippered holster containing a Ruger brand ammunition magazine containing live .45 caliber ammunition for a semiautomatic weapon was found on the floor among Natalie's belongings.  A spent shell casing from a .45 caliber handgun was discovered in the alley outside the garage; the casing was stamped with "Winchester .45 auto."  Although the interior of the condo

was sparsely furnished, officers found an inflatable bed in the living room, surrounded by personal items including Bradford's debit card.

¶9        Kevin gave the police Bradford's name and description and identified Bradford as the shooter in a photo lineup.  Two days later, Bradford was arrested without incident at a local restaurant.  Bradford admitted he had a .45 caliber handgun in the trunk of his vehicle, which he identified for the arresting officers.  Inside the vehicle, law enforcement officers found a wallet containing a driver's license and credit card issued to Bradford, a cell phone belonging to Bradford, several foldable massage tables, and a laptop-sized case containing several large knives, a stun gun, multiple boxes of ammunition, and a bill of sale for the handgun issued to Bradford.  The officers also found a Ruger .45 caliber semiautomatic handgun containing three rounds of live jacketed hollow-point ammunition with the same "Winchester .45 auto" stamp found on the casing discovered outside of the condo.

¶10       Bradford was thereafter charged with one count of first degree murder of Natalie and one count of aggravated assault against Kevin.  At trial, the medical examiner testified Natalie died within two minutes of being shot at the base of the skull and the wound characteristics were consistent with Kevin's memory of the events.  The lack of exit wound was also consistent with the jacketed hollow-point bullets found in the handgun recovered from Bradford's vehicle.  Both the shell casing recovered from the scene and a bullet fragment recovered from Natalie's head were determined to be of the same caliber and type as those found in the handgun.  And DNA testing indicated Bradford was a major contributor to DNA found on the magazine removed from the handgun.

¶11       At the close of the State's evidence, Bradford's counsel made an unsuccessful motion for judgment of acquittal pursuant to Arizona Rule of Criminal Procedure 20.  Bradford testified in his defense.

¶12       According to Bradford, he was "fine" with Natalie's decision to move back in with Kevin because he had never wanted a long-term relationship with her.  However, because Kevin had previously threatened to "beat and kill" him, Bradford took his gun from the trunk of his car when he met Kevin and Natalie at the condo.  After meeting Kevin and Natalie out front and directing them to the garage, Bradford opened the garage door from the inside.  He did not see Kevin or Natalie waiting there, walked toward a file cabinet near Natalie's belongings, and began to remove the gun from the case "just in case anything went wrong."  While he was bending down to unzip the case, Bradford "saw Kevin coming at [him]"

from behind and fumbled with the gun, adding for the first time on cross-examination that Kevin "collided" with his right hand and arm, and possibly the gun, during the event. Bradford then chased Kevin out of the garage. After finding Kevin prone in the bushes, Bradford panicked and ran.

**¶13** Bradford testified it was only after leaving the scene that it occurred to him "the gun had gone off" and Kevin was on the ground outside the garage because he had been shot. Although he purported to be concerned about Kevin, Bradford planned to wait out the Memorial Day weekend "to reverse engineer everything" before he approached police about his involvement. Bradford presented evidence that the lighting was poor in the garage and maintained he never saw Natalie during these events and was not aware she had been shot until after his arrest.

**¶14** On rebuttal, the case agent testified Bradford's version of the events was inconsistent with both his prior police interview and the physical evidence at the scene. Nor did she find Bradford's reaction, upon being informed of Natalie's death, was genuine.

**¶15** The jury found Bradford guilty as charged. Bradford knowingly and voluntarily waived his right to an aggravation hearing and admitted the crimes were dangerous offenses, involved the use of a dangerous instrument, and caused physical and emotional harm to the victims. After a mitigation hearing, Bradford was sentenced as a dangerous, non-repetitive offender to natural life for first-degree murder, followed by a slightly aggravated term of ten years for aggravated assault. Bradford was also given credit for 1,866 days of presentence incarceration. Bradford timely appealed, and we have jurisdiction pursuant to Arizona Revised Statutes (A.R.S.) sections 12-120.21(A)(1),[2] 13-4031, and -4033(A)(1).

## DISCUSSION

**¶16** Our review reveals no fundamental error. *See Leon*, 104 Ariz. at 300 ("An exhaustive search of the record has failed to produce any prejudicial error."). A person is guilty of first degree murder if, "[i]ntending or knowing that the person's conduct will cause death, the person causes the death of another person . . . with premeditation." A.R.S. § 13-1105(A)(1). A person is guilty of aggravated assault if he

---

[2] Absent material changes from the relevant date, we cite a statute's current version.

"[i]ntentionally plac[es] another person in reasonable apprehension of imminent physical injury" while "us[ing] a deadly weapon or dangerous instrument." A.R.S. §§ 13-1203(A)(2), -1204(A)(2). Based upon the record, sufficient evidence was presented upon which a jury could determine beyond a reasonable doubt that Bradford murdered Natalie with premeditation and committed aggravated assault against Kevin.

¶17  All of the proceedings were conducted in compliance with the Arizona Rules of Criminal Procedure. Bradford was represented by counsel at all stages of the proceedings, except for the period between May 2013 and October 2013 during which he knowingly and voluntarily waived his right to counsel but retained the assistance of advisory counsel. Bradford was present at all critical stages including the entire trial and the verdict. The jury was properly comprised of twelve jurors, and the record shows no evidence of jury misconduct. *See* Ariz. Const. art. 2, § 23; A.R.S. § 21-102(A); Ariz. R. Crim. P. 18.1(a). At sentencing, Bradford was given an opportunity to speak, and the trial court stated on the record the evidence and materials it considered and the factors it found in imposing sentences. *See* Ariz. R. Crim. P. 26.9, 26.10(b). Additionally, the sentences imposed were within the statutory limits. *See* A.R.S. §§ 13-704(A), -711(A), -751(A), -752(A).[3]

**CONCLUSION**

¶18  Bradford's convictions and sentences are affirmed. Defense counsel's obligations pertaining to Bradford's representation in this appeal have ended. Defense counsel need do no more than inform Bradford of the outcome of this appeal and his future options, unless, upon review, counsel finds an issue appropriate for submission to our supreme court by petition for review. *State v. Shattuck*, 140 Ariz. 582, 584-85 (1984).

---

[3]  When the underlying crimes occurred, the trial court had discretion to impose upon a person convicted of first degree murder "a sentence of life or natural life," with the former leaving open the possibility of release after twenty-five years. *See* A.R.S. §§ 13-751 (2009), -752(A) (2009). Following the 2012 amendments, a person convicted of first degree murder who is at least eighteen years of age must be sentenced to imprisonment for the remainder of his "natural life," unless the crime is classified as felony murder. *See* H.B. 2373, 2012 Ariz. Sess. Laws, ch. 207, § 3 (2d Reg. Sess.).

**¶19** Bradford has thirty days from the date of this decision to proceed, if he wishes, with an *in propria persona* petition for review. *See* Ariz. R. Crim. P. 31.19(a). Upon the Court's own motion, we also grant Bradford thirty days from the date of this decision to file an *in propria persona* motion for reconsideration.



AMY M. WOOD • Clerk of the Court
FILED: AA