NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

JESSIE PAUL OGLE, *Appellant*.

No. 1 CA-CR  15-0739
FILED 2-7-2017

Appeal from the Superior Court in Maricopa County
No.  CR2014-150017-001
The Honorable Bradley H. Astrowsky, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joseph T. Maziarz
*Counsel for Appellee*

Brown & Little PLC, Tempe
By Matthew O. Brown
*Counsel for Appellant*

_____

**MEMORANDUM DECISION**

Judge Jon W. Thompson delivered the decision of the Court, in which Presiding Judge Randall M. Howe and Judge Lawrence F. Winthrop joined.

_____

**T H O M P S O N**, Judge:

¶1            Defendant, Jesse Paul Ogle (Ogle), appeals his convictions and sentences for sexual assault, kidnapping and sexual abuse. For the reasons that follow, we affirm.

**FACTUAL AND PROCEDURAL HISTORY**

¶2            Ogle managed "Streamate," a pornographic webcam business with operations located in Tempe, Mesa, Scottsdale and Phoenix. To recruit "webcam models," Ogle posted job listings for administrative assistant positions. Streamate staff then reviewed the applications and selected only young women between ages 18 and 26 for interviews.

¶3            When the applicants arrived for their interviews, Streamate staff informed the young women that the administrative assistant positions had been filled, but higher-paying positions as web models were available. The young women who accepted the web model positions were then trained to meet customers online in a free, public domain and invite the customers to join them in a "private chat." Once customers entered the private chat sphere, they were charged $3-6 per minute to watch the young women engage in sexually-oriented activity.

¶4            Between 2011 and 2014, five Streamate web models working at different locations – J.P., K.C., K.W., M.S., and K.D. - independently reported to police that Ogle had assaulted them. On October 24, 2014, the state charged Ogle with four counts of sexual abuse (counts 1, 6, 10, 11), thirteen counts of sexual assault (counts 2, 4, 7, 8, 9, 13, 14, 16, 17, 18, 19, 21, and 22), and six counts of kidnapping (counts 3, 5, 12, 15, 20, and 23). The state also alleged aggravating circumstances.

¶5            At trial, Ogle admitted that he had engaged in sex acts with K.D. M.S., K.C., and K.W., but claimed the encounters were consensual. He denied engaging in sex acts with J.P.

¶6        After the state's presentation of evidence, the trial court entered uncontested verdicts of acquittal on two counts of sexual assault (counts 9 and 22) and one count of sexual abuse (count 11). The jury then acquitted Ogle of counts 1, 2, 3, and 12, but found him guilty of the remaining charges.  Ogle waived his right to a jury trial on aggravating circumstances and the court found two aggravating factors: (1) harm to the victim, and (2) multiple victims.  The trial court then sentenced Ogle to presumptive, consecutive terms of seven years' imprisonment on each count of sexual assault (counts 4, 7, 8, 13, 14, 16, 17, 18, 19, and 21), and presumptive, concurrent terms of imprisonment on each count of sexual abuse and kidnapping (counts 5, 6, 10, 15, 20, 23).  Ogle timely appealed. We have jurisdiction pursuant to Arizona Revised Statutes (A.R.S.) §§ 12-120.21(A)(1) (2016), 13-4031 (2016), and -4033(A)(1) (2016).

## DISCUSSION

¶7        On appeal, we view the facts in the light most favorable to upholding the verdict and resolve all reasonable inferences against the defendant.  *State v. Harm*, 236 Ariz. 402, 404 n.2, ¶ 2, 340 P.3d 1110, 1112 n. 2 (App. 2015) (citing *State v. Valencia*, 186 Ariz. 493, 495, 924 P.2d 497, 499 (App. 1996)).

### I.    Prosecutorial Misconduct

¶8        Ogle asserts the prosecutor engaged in misconduct by portraying Ogle as a racist, raising improper matters for the jury's consideration, questioning Ogle regarding another witness's truthfulness, characterizing Ogle as a liar, and shifting the burden of proof.

¶9        We separately review each instance of alleged prosecutorial misconduct, and the attendant standard of review for each claim depends upon whether Ogle objected to the alleged misconduct in the trial court.  If he objected, we review for harmless error, but if he failed to object, we review only for fundamental error.  *State v. Henderson*, 210 Ariz. 561, 567, ¶¶ 18-19, 115 P.3d 601, 607 (2005).  "Error is harmless only if we can say, beyond a reasonable doubt, that it did not contribute to or affect the verdict."  *State v. Green*, 200 Ariz. 496, 501, ¶ 21, 29 P.3d 271, 276 (2001) (internal quotation and citation omitted).  Under harmless error review, the state bears the burden of proof.  *Henderson*, 210 Ariz. at 567, ¶ 18, 115 P.3d at 607.  Fundamental error, on the other hand, is "error going to the foundation of the case, error that takes from the defendant a right essential to his defense, and error of such magnitude that the defendant could not possibly have received a fair trial."  *Id.* at ¶ 19 (internal quotation and

citations omitted).  Under fundamental error review, the defendant bears the burden of demonstrating both fundamental error and resulting prejudice.  *Id*. at ¶ 20.

**¶10**　　　　Prosecutorial misconduct is not "merely the result of legal error, negligence, mistake or insignificant impropriety." *Pool v. Superior Court (Pima Cty.)*, 139 Ariz. 98, 108, 677 P.2d 261, 271 (1984).  Rather, viewed in its entirety, it is "intentional conduct" that the prosecutor "knows to be improper and prejudicial, and which he pursues for any improper purpose." *Id*. at 108-09, 677 P.2d at 271-72.  To prevail on a claim of prosecutorial misconduct, a defendant "must demonstrate that the prosecutor's misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Roque*, 213 Ariz. 193, 228, ¶ 152, 141 P.3d 368, 403 (2006) (quotations and citations omitted).  "Reversal on the basis of prosecutorial misconduct requires that the conduct be so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id*.  Thus, even improper comments by the prosecutor will not warrant reversal of a defendant's convictions unless there is a "reasonable likelihood" that the "misconduct could have affected the jury's verdict." *State v. Newell*, 212 Ariz. 389, 403, ¶ 67, 132 P.3d 833, 847 (2006) (internal quotation and citation omitted).

### A.　References to Racism

**¶11**　　　　To commence his opening statement to the jury, the prosecutor stated:

> Montgomery, Alabama, December 1st, 1955, 42-year-old Rosa Parks refuses to obey the order of bus driver, James Blake, to give up her seat to a white passenger.  Rosa Parks' experience is the most well-known.  But others experience[d] the same type of discrimination, including Bayard Rustin, 1942, Irene Morgan, 1946, and Sarah Louis Keys, 1952.
>
> Now, while the places were different and the dates were different, each had the same elements in different places and different times that it can only truly be said that a pattern had formed which pointed not to an isolated incident, an isolated incident of discrimination, but a common theme of discrimination, a common thread of discrimination.
>
> And now I want to talk about this case.  Five different women from four different locations over a two-and-a-half-year period of time, who don't know each other, came forward to

4

> report that they were sexually assaulted in a particular way by a specific person, pointing not to an isolated incident but to a pattern.
>
> And that pattern points to the person who's guilty of committing these sexual assaults, and that pattern all points to one person, and that's Jessie Paul Ogle.

Later, at the end of his closing argument, the prosecutor referred back to his opening statements regarding Rosa Parks, read a letter Parks had written in which she recounted her own experience with an attempted sexual assault, and argued that Parks successfully fought against racial discrimination because she had community support, but suggested she was unable to find similar community support to combat sexual assault.

¶12            Although Ogle failed to object in the trial court, he now contends that the prosecutor's opening statements and closing argument improperly linked him to historic racism, leaving the impression he is racist. Contrary to Ogle's argument, the record does not reflect that the prosecutor portrayed him as racist. Instead, viewing the statements and argument in context, the prosecutor attempted to connect the individual victims' accounts by characterizing the charged acts as a pattern of behavior, rather than isolated incidents, and did so by drawing a parallel to several incidents of historic racial bias, which were part of a broader pattern of systemic racial discrimination. Clearly, the prosecutor referenced historic racism, but he did not ascribe any racist views or motivations to Ogle when presenting the attenuated analogy.

¶13            Moreover, even if the prosecutor's comments were improper, the record does not support Ogle's claim that misconduct so permeated the trial as to have deprived him of due process. Importantly, both at the beginning of the trial and before jury deliberations, the court instructed the jury that the attorneys' statements were not evidence, and we presume that the jurors followed these instructions. *Newell*, 212 Ariz. at 403, ¶ 69, 132 P.3d at 847; *see also State v. Bowie*, 119 Ariz. 336, 340, 580 P.2d 1190, 1194 (1978) ("Any possible prejudice from the opening statement was overcome by the court's cautionary instructions that evidence did not come from the attorneys and that the verdict must be determined only by reference to the evidence[.]"). Therefore, Ogle has not shown that fundamental error resulted from the prosecutor's statements and argument.

¶14            Next, Ogle contends that the prosecutor improperly inserted racial issues into the trial by asking one of Ogle's Streamate employees to

describe the "type of females" she was instructed to select for interviews when sorting applications. The witness answered "[Ogle] didn't like black women, [and] wanted younger." The prosecutor followed-up by asking whether there was a specific "age range" sought, and the witness answered that she looked for women who were at least eighteen years old but did not graduate from high school before 2006.

¶15      Although Ogle did not raise a contemporaneous objection to these questions, he subsequently moved in limine to exclude any further evidence of racial bias in hiring practices. After reviewing the motion, the court inquired regarding the state's position, and the prosecutor responded that he would not argue racial bias or present any evidence regarding that issue. The trial court then granted Ogle's motion in limine and neither party referenced Ogle's racial hiring preferences again. On this record, and reading the prosecutor's questions in context, it is clear that the prosecutor was attempting to elicit testimony regarding the age of the young women Ogle targeted, not Ogle's racial preferences. Accordingly, the prosecutor did not engage in misconduct by asking that line of questions.

### B.   Improper Matters Before the Jury

¶16      Ogle argues the prosecutor engaged in misconduct by bringing improper matters to the jury's attention.

¶17      First, during direct examination, victim M.S. testified that she experienced "intense diarrhea" and was "really sick" after Ogle anally raped her. On cross-examination, defense counsel questioned whether M.S. had in fact consented to the sexual activity, which she denied. During redirect, the prosecutor elicited testimony that M.S. had told Ogle he was "hurting" her during the assault. The prosecutor then asked, over objection, whether M.S. sustained any injuries from the assault, and M.S. stated that she did. The prosecutor inquired regarding the nature of the injuries, and M.S. testified that she bleeds anally "[e]very time" she uses the restroom. The prosecutor then asked, "Still to this day?" and M.S. responded, "To this day still."

¶18      At that point, the prosecutor concluded his redirect examination and defense counsel moved to strike M.S.'s injury testimony, acknowledging he knew M.S. had reported an anal injury on the date of her forensic exam, but arguing the state had failed to disclose that the injury persisted. In response, the prosecutor stated that he was aware M.S. had sustained anal injuries, but did not "know she was going to say that she was still bleeding today." After hearing from the parties, the trial court

determined that only M.S.'s injuries at the time of the assault had been disclosed, and therefore struck her final statement regarding the current state of her resulting injuries.

¶19        Pursuant to Arizona Rule of Criminal Procedure 15 (Rule 15), the state must disclose, among other things, the name and written or recorded statement of any witness, any law enforcement reports, and the results of any physical examinations or scientific tests.  Applying the rule here, the record reflects that the state disclosed the forensic report from M.S.'s physical examination to the defense.  Indeed, defense counsel acknowledged that he knew M.S. had reported an injury.

¶20        On this record, there is no basis to conclude that the state subsequently obtained and failed to disclose an updated statement from M.S. regarding the state of her current injuries.  To the contrary, the prosecutor specifically avowed that he was unaware that M.S. still experienced bleeding as a result of the sexual assault.  Accordingly, the prosecutor neither failed to comply with Rule 15 nor engaged in misconduct on this basis.

¶21        Nonetheless, even if the state failed to comply with Rule 15's disclosure requirements and the prosecutor's question was improper, any potential harm was cured when the trial court struck M.S.'s testimony regarding the current state of her injuries and instructed the jury not to consider it.  We presume jurors follow their instructions and Ogle has failed to present any evidence to overcome this presumption. *See Newell*, 212 Ariz. at 403, ¶ 69, 132 P.3d at 847.  Therefore, even assuming the prosecutor improperly elicited the injuries testimony from M.S., any error was harmless.

¶22        Second, Ogle contends the prosecutor improperly elicited testimony that he had a venereal disease.

¶23        During direct examination, K.W. testified that Ogle attempted to kiss her mouth, which she repeatedly resisted. He, however, "got [her] on, . . ., the side of [her] mouth."  On cross-examination, defense counsel asked K.W. whether she was afraid she may have contracted a sexually transmitted disease from Ogle, and K.W. answered that she was concerned about venereal diseases and had requested testing when she went to urgent care following the assault.  On redirect examination, the prosecutor asked K.W. whether Ogle "had some sort of herpes or something on his mouth." Defense counsel objected, arguing the question was beyond the scope of cross-examination, which the trial court sustained.

7

¶24　　Contrary to the trial court's ruling that the prosecutor's question was improper, the record reflects that defense counsel elicited testimony on cross-examination regarding K.W.'s concern about sexually-transmitted diseases, and the prosecutor's subsequent attempt to clarify why K.W. suspected Ogle may have a venereal disease was therefore not beyond the scope. Nonetheless, even if the question was improper, the trial court sustained the objection and later instructed the jurors to disregard any answers given when the court sustained an objection. We presume jurors follow their instructions and Ogle has failed to present any evidence to overcome this presumption. *See Newell*, 212 Ariz. at 403, ¶ 69, 132 P.3d at 847. Therefore, even if the prosecutor improperly questioned K.W. regarding the basis for her belief that Ogle had a venereal disease, any error was harmless.

¶25　　Last, Ogle asserts the prosecutor engaged in misconduct by comparing the victims in this case to Rosa Parks. Specifically, Ogle argues the prosecutor's attempt to analogize "the plight" of the victims to that of a recognized and revered historical figure "essentially ask[ed] the jury to convict" in order to "protect community values and preserve civil order."

¶26　　Prosecutors are given "wide latitude" in presenting closing argument to the jury. *State v. Goudeau*, 239 Ariz. 421, 466, ¶ 196, 372 P.3d 945, 990 (2016). This latitude is not unlimited, however, and a prosecutor exceeds permissible bounds "when he uses his remarks to inflame the minds of jurors with passion or prejudice" and urges the jurors to convict a defendant in order to protect community values independent of the defendant's guilt or innocence. *State v. Herrera*, 174 Ariz. 387, 396, 850 P.2d 100, 109 (1993).

¶27　　Here, the prosecutor's statements comparing the victims to Rosa Parks arguably "had emotional overtones," but "some amount of emotion in closing argument is not only permissible, it is to be expected." *State v. Zaragoza*, 135 Ariz. 63, 68, 659 P.2d 22, 27 (1983). Read in context, the prosecutor's statements regarding unity and support emphasized that the individual victims' accounts were strengthened by their overlapping evidence and commonality. At no point did the prosecutor "improperly appeal to the jurors' emotions, passions or prejudices by urging them to convict [Ogle] for reasons wholly irrelevant to his own guilt or innocence." *Herrera*, 174 Ariz. at 397, 850 P.2d at 110 (internal quotation omitted). Therefore, the prosecutor's closing argument did not exceed permissible bounds.

¶28

8

## C. Question Regarding Witness's Truthfulness

**¶29**     On cross-examination, the prosecutor questioned Ogle at length regarding Streamate's recruitment of web models, including the false job postings for administrative assistants. The prosecutor then asked whether Ogle directed the marketing, which he denied. At that point, the prosecutor attempted to impeach Ogle's testimony with the statement of Streamate employee Chelsea Baker, who testified that Ogle directed Streamate's marketing. Ogle disputed the prosecutor's characterization of Baker's testimony, saying "I don't believe she [testified that Ogle directed marketing]." The prosecutor responded, without objection, "Yes, she did. Are you saying she's lying?" and Ogle answered, "I'm saying that you didn't hear her the way I heard her."

**¶30**     "[Q]uestioning a witness on whether another witness lied" may "invade the jury's province to determine witness credibility" and fail to account for other possible explanations for contradictory testimony. *State v. Morales*, 198 Ariz. 372, 375, ¶ 12, 10 P.3d 630, 633 (App. 2000). Despite these concerns, such questions are not always improper, but "the safest and recommended course is for parties to refrain from asking such questions." *Id*. at ¶ 13. Nonetheless, " '[w]ere they lying' questions alone will rarely amount to fundamental error." *Id*. at 376, ¶ 15, 10 P.3d at 634.

**¶31**     In this case, Ogle had the opportunity to dispute the prosecutor's characterization of Baker's testimony and explain his role in recruiting webcam models. Given Ogle's ability to attribute any alleged inconsistency between Baker's testimony and his own to a misunderstanding, and the trial court's instruction that the attorneys' statements were not evidence and the jurors were the sole triers of witness credibility, the prosecutor's question, if improper, was not prejudicial.

## D. Referring to Ogle as a Liar

**¶32**     At the outset of cross-examination, the prosecutor asked, without objection, "I'd like to start with something that I think we can all agree on, that you're a liar, aren't you?" Ogle responded, "I don't necessarily agree with that." The prosecutor then questioned Ogle thoroughly regarding Streamate's hiring practices, specifically referencing the victims' testimony that they had responded to job postings for administrative assistants, not web models.

**¶33**     A prosecutor should refrain from expressing a "personal belief about the credibility of a witness," *see State v. Lamar*, 205 Ariz. 431, 441, ¶ 54, 72 P.3d 831, 841 (2003), but may comment on a witness's

credibility when the "remarks are based on the facts in evidence." *State v. Williams*, 113 Ariz. 442, 444, 556 P.2d 317, 319 (1976). Moreover, even an improper comment on a witness's truthfulness or lack thereof "does not rise to the level of fundamental error." *Lamar*, 205 Ariz. at 441, ¶ 54, 72 P.3d at 841.

¶34 Applying these principles here, the prosecutor characterized Ogle as a liar during cross-examination, but clearly tethered the description to evidence already presented regarding Streamate's bait-and-switch recruiting techniques and Ogle's role as manager of operations. Because the prosecutor presented the characterization during cross-examination, Ogle had the opportunity to respond directly, refute the characterization, and provide an alternative explanation for the perceived inconsistencies between his testimony and that of other witnesses regarding his role in recruitment. In addition, the court instructed the jury that the attorneys' statements were not evidence and the jurors alone determined witness credibility. *See State v. King*, 110 Ariz. 36, 43, 514 P.2d 1032, 1039 (1973) (holding prosecutor's expression of personal opinion as to defendant's guilt and at least two avowals as to a witness's credibility did not prejudice the defendant, so as to warrant reversal, because the court instructed the jury that the lawyers' statements were not evidence). Therefore, even assuming the prosecutor's question was improper, it did not constitute fundamental error.

### E. Burden Shifting

¶35 During his direct examination, Ogle testified that he had exchanged texts with some of the victims before they reported that he had assaulted them. On cross-examination, the prosecutor referenced this testimony and questioned Ogle's failure to present the text messages as evidence "to prove, or corroborate" his story. At that point, the parties approached the bench and the trial court admonished the prosecutor to avoid using the word "prov[e]" when discussing Ogle's failure to present evidence. The prosecutor then questioned Ogle's failure to call several witnesses that he alleged could corroborate portions of his testimony.

¶36 A prosecutor may question or comment on a defendant's failure to produce evidence to support an affirmative defense without shifting the burden of proof, provided the prosecutor does not "call attention to the defendant's own failure to testify." *State v. Fuller*, 143 Ariz. 571, 575, 694 P.2d 1185, 1189 (1985); *see also State v. Sarullo*, 219 Ariz. 431, 437, ¶ 24, 199 P.3d 686, 692 (App. 2008) ("When a prosecutor comments on a defendant's failure to present evidence to support his or her theory of the

case, it is neither improper nor shifts the burden of proof to the defendant so long as such comments are not intended to direct the jury's attention to the defendant's failure to testify.").

¶37　　　　In this case, Ogle testified at trial and explained that he had consensual sexual activity with four of the victims and no sexual encounters with the remaining victim. Given Ogle's trial testimony, the prosecutor's questions addressing his failure to present evidence supporting his defense were within permissible bounds and did not constitute improper burden shifting.

### F. Cumulative Misconduct

¶38　　　　Finally, Ogle argues the cumulative effect of prosecutorial misconduct in this case warrants reversal.

¶39　　　　Even when individual acts of prosecutorial misconduct are harmless, the cumulative effect of the incidents may demonstrate "that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant[.]" *Roque*, 213 Ariz. at 228, ¶ 155, 141 P.3d at 403 (internal quotation and citation omitted). Therefore, after reviewing each separate incident for error, "we must evaluate their cumulative effect on the trial." *Id*.

¶40　　　　In this case, having found no action by the prosecutor that constitutes misconduct, "there can be no cumulative effect of misconduct sufficient to permeate the entire atmosphere of the trial with unfairness." *State v. Bocharski*, 218 Ariz. 476, 492, ¶ 75, 189 P.3d 403, 419 (2008).

### II.　　Jury Instruction

¶41　　　　Ogle contends the trial court committed reversible error by failing to instruct a reconstituted jury to commence its deliberations anew. Because Ogle did not raise this objection in the trial court, we review only for fundamental, prejudicial error. *See Henderson*, 210 Ariz. at 567, ¶¶ 19-20, 115 P.3d at 607.

¶42　　　　Pursuant to Arizona Rules of Criminal Procedure 18.5(h) (Rule 18.5(h)), "[i]n the event a deliberating juror is excused . . ., the court may substitute an alternate juror . . . to join in the deliberations. If an alternate joins the deliberations, the jury *shall* be instructed to begin deliberations anew." (Emphasis added.) Although a trial court's failure to instruct a reconstituted jury to commence deliberations anew, as mandated by Rule 18.5(h), is clear error, "the omission of such an instruction does not

always require reversal of a conviction." *State v. Kolmann*, 239 Ariz. 157, 162, ¶ 19, 367 P.3d 61, 66 (2016) (citations omitted). To make the required additional showing of prejudice, a defendant "must show that the trial court's failure to instruct the reconstituted jury to begin deliberations anew denied him a deliberative, impartial, unanimous jury verdict, not merely that the jury could have reached a different result had the instruction been given." *State v. Dalton*, 241 Ariz. 182, __, ¶ 18, 385 P.3d 412, 417 (2016), *vacating and remanding* 239 Ariz. 74, 78, ¶ 9, 366 P.3d 133, 137 (App. 2016).

¶43        Here, after the attorneys presented their closing arguments, the trial court provided the jury with its final instructions and designated Jurors 3 and 14 as alternates.  Only five minutes after the jurors retired "to consider their verdicts[,]" the court recessed until 10:45 a.m. on September 21, 2015, "at which time the jury [was scheduled to] commence deliberations." However, on the morning of September 21, Juror 5 did not appear and court personnel were unable to contact the juror by telephone. The trial court excused Juror 5 from service and Juror 3 was selected to join the remaining jurors for deliberations.

¶44        Contrary to Ogle's argument, however, the record reflects that Juror 3 did not in fact join existing deliberations, but was present for all jury deliberations.  Because Juror 3 was present for all deliberations, there is no basis for this court to conclude that the trial judge's failure to instruct the jurors to begin their deliberations anew denied Ogle a "deliberative, impartial, unanimous jury verdict."

## CONCLUSION

¶45      Ogle's convictions and sentences are affirmed.



AMY M. WOOD • Clerk of the Court
FILED: AA